1               UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4

5

    UNITED STATES OF AMERICA,           .
6                                         .
            PLAINTIFF,                    . NO. 11-CR-0471
7                                         .
                 V.                       . DECEMBER 19, 2011
8                                         .
    MAURICE LEROME SMITH,                 . 11:43 A.M.
9                                         .
            DEFENDANT.                    . SAN DIEGO, CALIFORNIA
10      . . . . . . . . . . . . . .       .

11

12

13       TRANSCRIPT OF SENTENCING WITH PRESENCE REPORT
              BEFORE THE HONORABLE ROGER T. BENITEZ
14              UNITED STATES DISTRICT JUDGE

15
       APPEARANCES:
16                              UNITED STATES ATTORNEY'S OFFICE
                                BY:  ALESSANDRA SERANO, ESQ.
17                              BY:  MATTHEW GARDNER, ESQ.
                                880 FRONT STREET, ROOM 6293
18                              SAN DIEGO, CALIFORNIA  92101

19      FOR THE DEFENDANT:      LAW OFFICE OF JOHN LANAHAN
                                BY:  JOHN O. LANAHAN, ESQ.
20                              550 WEST C STREET, SUITE 1670
                                SAN DIEGO, CALIFORNIA  92101

21

22      COURT REPORTER:         DEBORAH M. O'CONNELL, RPR, CSR
                                880 FRONT STREET, ROOM 4290
23                              SAN DIEGO, CALIFORNIA, 92101

24
    REPORTED BY STENOTYPE, TRANSCRIBED BY COMPUTER
25

1          SAN DIEGO, CALIFORNIA, DECEMBER 19, 2011, 11:43 A.M.

2                              * * * *

3          THE CLERK:  THREE ON CALENDAR, CASE NO. 11-CR-0471,

4    USA VS. MAURICE LEROME SMITH, SENTENCING WITH PRE-SENTENCE

5    REPORT.

6          MS. SERANO:  GOOD MORNING, YOUR HONOR.  ALESSANDRA

7    SERANO, AND MATTHEW GARDNER, ON BEHALF OF THE UNITED STATES.

8          MR. LANAHAN:  GOOD MORNING, YOUR HONOR.  JOHN

9    LANAHAN, ON BEHALF OF MR. SMITH, WHO IS IN CUSTODY, NOT YET

10   PRESENT.

11        YOUR HONOR, MR. SMITH IS NOW PRESENT AND READY BEFORE THE

12   COURT.

13         THE COURT:  ALL RIGHT, THIS MATTER IS SET FOR

14   SENTENCING TODAY.  I NOTE UNDER BOOKER THE GUIDELINES ARE

15   ADVISORY.  I WILL IMPOSE SENTENCE BASED ON 3553(A) FACTORS.

16         MR. LANAHAN, I HAVE REVIEWED YOUR OBJECTIONS.  FRANKLY,

17   NONE OF THE OBJECTIONS -- OR NONE OF THE FACTS THAT YOU HAD

18   ADDRESSED IN CONNECTION WITH THE FACTUAL ALLEGATIONS REALLY

19   WOULD MAKE A WHOLE LOT OF DIFFERENCE.  I THINK, AT THIS POINT

20   IN TIME, SO FAR AS MY SENTENCING IS CONCERNED, WITH THE

21   POSSIBLE EXCEPTION, THERE IS SOMETHING ABOUT THE RELATIONSHIP

22   OF THE DEFENDANT WITH MS. HOLMES, BUT EVEN THAT, I THINK, WOULD

23   BE VERY, VERY MINOR.

24        THE GUIDELINE DISPUTES, I'VE REVIEWED THE GUIDELINE

25   DISPUTES.  AND I'LL LET YOU ADDRESS THOSE.  I SUSPECT YOU KNEW

1    BEFORE YOU TOOK THIS CASE AND BEFORE YOU CAME IN TODAY THAT YOU

2    REALLY HAD AN UPHILL BATTLE, RIGHT?

3              MR. LANAHAN:  I FIGURED THAT THIS WAS --

4              THE COURT:  IT'S A TOUGH CASE FOR YOU.

5              MR. LANAHAN:  YOUR HONOR, IT IS A VERY SERIOUS CASE.

6    AND I KNOW FROM REVIEWING DISCOVERY, OBVIOUSLY, FROM READING

7    THE PRE-SENTENCE REPORT.  AND I WAS PRESENT FOR THE SENTENCING

8    HEARING, SO IT'S AN EXTREMELY SERIOUS CASE.

9         AND JUST SO THE COURT KNOWS, I DIDN'T TRY THE CASE.  MUCH

10   OF THE FACTUAL DISPUTES THAT I'M RAISING ESSENTIALLY MAY

11   ULTIMATELY -- WE'RE RAISING OTHER ISSUES IN TERMS OF APPEALING

12   THE TRIAL.  AND I DON'T WANT TO CONCEDE CERTAIN THINGS BEFORE

13   THE SENTENCING.  BUT LET ME BOIL IT DOWN TO WHAT I THINK ARE

14   THE REAL POINTS THAT I THINK THE COURT NOW, IN LOOKING AT THE

15   CASE, WOULD BE FACTORS THAT WOULD BE SIGNIFICANT DISPUTES OVER

16   SENTENCING.

17        THE FIRST ONE IS, ESSENTIALLY, ROLE.  AND AS I'M READING

18   THIS, AND AS I'M READING THE FACTS OF THE CASE, THE NATURE OF

19   THIS PARTICULAR OFFENSE IS THE USE OF A MINOR FOR SEXUAL

20   PROHIBITED SEXUAL ACTIVITY.  THERE IS ONLY ONE MINOR; AND,

21   THEREFORE, YOU CANNOT COMMIT THIS OFFENSE WITHOUT SOMEHOW

22   INVOLVING SOMEONE ELSE.

23        IF, IN FACT, HE DOES NOT DO THAT, THERE IS NO CRIME.  SO

24   I'M NOT ASKING FOR A MINOR ADJUSTMENT, BUT I'M NOT ASKING FOR

25   AN AGGRAVATED ADJUSTMENT.  THIS IS THE OFFENSE.  IF THERE WERE

1    MULTIPLE VICTIMS --

2          THE COURT:  LET ME ASK YOU A QUESTION.

3          MR. LANAHAN:  SURE.

4          THE COURT:  ONE COULD ENGAGE IN SEX TRAFFICKING WITH

5    A MINOR -- I SEE WHAT YOU'RE SAYING.

6          MR. LANAHAN:  WELL, ONE COULD AID AND ABET.  OR THERE

7    COULD BE LESSER PEOPLE THAT WERE BEING INVOLVED IN THIS, BUT AS

8    I'M READING -- AND AGAIN, I WASN'T PRESENT AT THE TRIAL, SO I

9    CANNOT -- BUT AS I'M READING OVER WHAT IT LOOKS LIKE ARE THE

10   FACTUAL CIRCUMSTANCES THAT WERE LAID OUT IN THE PRE-SENTENCE

11   REPORT, THIS IS NOT A NUMBER OF PEOPLE BEING INVOLVED.

12   ESSENTIALLY, IT WAS AND IS MR. SMITH'S DEFENSE THAT THE MINOR

13   IN THIS CASE WAS NOT -- SHE WAS A SCHEDULER; SHE WAS NOT

14   ACTUALLY OPERATING AS A PROSTITUTE.

15         THE COURT:  I THINK THAT IS DIFFERENT THAN THE

16   EVIDENCE I HEARD AT TRIAL.

17         MR. LANAHAN:  WELL, NO, I UNDERSTAND.  AND I'M NOT --

18   AS I SAID, THE COURT HAS SEEN THIS, AND I'M NOT GOING TO REHASH

19   THAT, THOSE FACTUAL ALLEGATIONS.  BUT, WHAT DOES SEEM TO BE THE

20   CIRCUMSTANCES THAT ARE FOUND HERE, THERE ARE NOT A NUMBER OF

21   PEOPLE BEING SUPERVISED.  IN FACT, IF SHE'S TAKING THE

22   GOVERNMENT'S POSITION, IF SHE IS NOT THE SCHEDULER, THEN SHE IS

23   THE ONLY PERSON, FROM THE FACTS AND CIRCUMSTANCES AND RELEVANT

24   CONDUCT OF THIS CASE, WITHOUT WHICH HE IS NOT CONVICTED.  SO

25   FOR THAT BASIS, EITHER -- HE NEITHER GETS NEITHER A MINOR -- HE

1  DOESN'T GET ANYTHING DOWN OR ANYTHING UP WITHOUT THAT.  THIS IS

2  THE BASELINE.  THE OTHER IS -- AND OBVIOUSLY, I HAVE HEARD THE

3  PHONE CALLS.  I HAVE HEARD THE GOVERNMENT'S DEPARTURE MEMO.

4  PROBATION DOESN'T RECOMMEND IT, SO I GUESS I'M NOT REALLY

5  OBJECTING TO THE PRE-SENTENCE REPORT THAT THE GOVERNMENT IS

6  ASKING FOR -- NOT A DEPARTURE OR NOT AN UPWARD ADJUSTMENT FOR

7  OBSTRUCTION.

8      I HAVE LISTENED TO THE PHONE CALLS.  I HAVE TO SAY THEY

9  WERE LONG.  IN REVIEWING OVER THE CASE THE GOVERNMENT HAS

10  CITED, IT DIDN'T APPEAR THAT THERE WERE ANY THREATS.  THE ONE

11  CASE THAT I THINK IS PROBABLY THE CLOSEST -- THERE WERE A

12  COUPLE CASES IN WHICH THERE WERE -- APPEARED TO BE VEILED

13  THREATS.  AND IN LISTENING TO THESE CONVERSATIONS, IT DOESN'T

14  SOUND LIKE VEILED THREATS.

15      IT WASN'T -- THERE IS ANOTHER CASE IN WHICH THERE WAS A

16  QUESTION ABOUT THEY SHOULDN'T BE INVOLVED WITH CO-DEFENDANTS,

17  TALKING ABOUT CO-DEFENDANTS AND SOMEHOW COORDINATING THEIR

18  TESTIMONY TO SORT OF TAILOR IT.  THAT IS NOT THIS CASE.  THERE

19  IS A CASE IN THE FIFTH CIRCUIT THE GOVERNMENT CITES THAT SAYS,

20  THEY WANTED SOMEONE TO HELP.

21      BUT AS I'M LISTENING TO THE TAPE, AND THE TAPE THAT IS

22  GOING ON, OR THE RECORDING, MR. SMITH IS SAYING, YOU DON'T HAVE

23  TO -- THERE -- I'M NOT TELLING YOU WHAT TO DO, I'M JUST SAYING

24  THAT I DON'T THINK WHAT HAPPENED -- WE ALL KNOW WHAT WAS BEING

25  SAID WASN'T TRUE, AND IS ASKING THIS PARTICULAR WITNESS TO SAY

1    SOMETHING DIFFERENT THAN THE VERSION SHE SAID IN COURT.

2        NOW, THAT IS DIFFERENT, I THINK, THAN ASKING -- IF I'M

3    LOOKING AT -- I'M, PERHAPS, ANALOGIZING THIS TO DISSUADE -- BUT

4    I LOOKED AT THE NINTH CIRCUIT LAW.  THE NINTH CIRCUIT LAW IS,

5    IT IS OKAY TO CONTACT SOMEBODY AND SAY, LOOK, I THINK YOU

6    SHOULD TELL THE TRUTH.  I DON'T LIKE WHAT I THINK YOU'RE GOING

7    TO SAY BECAUSE I DON'T THINK IT IS THE TRUTH.  THAT IS

8    DIFFERENT THAN SAYING, I DON'T THINK YOU SHOULD SAY THIS OR

9    ELSE, I DON'T THINK YOU SHOULD DO IT AS A FAVOR TO ME, I DON'T

10   THINK YOU SHOULD DO IT FOR MONEY, OR SOME OTHER THING THAT IS

11   OUTSIDE.  BUT IT IS UNLAWFULLY INFLUENCING THE WITNESS.

12       NOW, I HAVE TO SAY -- I MEAN, CERTAINLY, WERE I HIS LAWYER

13   AT THE TIME, I WOULD PROBABLY -- IF I FOUND OUT ABOUT THE

14   TAPES, I WOULD HAVE SAID, WHAT DID YOU DO?  AND I WAS NOT, AS

15   WE KNOW FROM THE ARGUMENTS.  BUT AS I'M LISTENING TO THE ACTUAL

16   CIRCUMSTANCES OF THE TAPE ITSELF, IT APPEARS TO ME MR. SMITH

17   RAMBLES A LOT, TALKS A LOT.  BUT THERE REALLY ISN'T MUCH -- I'M

18   SURE THE COURT HAS HEARD IT.  BUT, ESSENTIALLY, WHAT HE'S

19   SAYING IS, I DON'T THINK WHAT YOU SAID IS THE TRUTH, I'M NOT

20   TELLING YOU WHAT TO DO, BUT PLEASE CONSIDER WHAT I'M SAYING,

21   AND CHANGE WHAT YOU SAID.  I MEAN, THAT, CERTAINLY, IS THE

22   PROBLEM WITH WHAT IT IS.

23       BUT I DON'T THINK THAT AMOUNTS TO OBSTRUCTION.  SO,

24   ESSENTIALLY, FOR PURPOSES OF THE SERIOUS KIND OF GUIDELINE

25   DISPUTES, I WOULD NOT BE ASKING -- NOT ASKING THE COURT TO DO A

1   ROLE ADJUSTMENT, WHICH WOULD DROP IT DOWN, ACCORDING TO THE --

2   NOT INCREASE AND WOULD ULTIMATELY DROP DOWN TO -- SO THOSE ARE

3   THE -- I MEAN, THE REST OF THEM ARE FACTUAL DISPUTES.

4        AND THE REASON I RAISE THESE, AS JUDGE IRWIN USED TO SAY

5   WHEN WE WOULD BRING THESE UP, THESE -- MR. SMITH IS GOING TO GO

6   TO PRISON NO MATTER WHAT.  AND I WANT TO MAKE SURE THAT THESE

7   ARE AS ACCURATE AS I CAN.  MAYBE IT WOULD MAKE A DIFFERENCE,

8   MAYBE IT WOULDN'T.

9        AND I UNDERSTAND THE COURT, OBVIOUSLY, HAS SEEN IT AND CAN

10  DECIDE WHETHER IMPORTANT FACTS ARE IN DISPUTE.  BUT FOR

11  PURPOSES OF AT LEAST THE GUIDELINES, I CAN MOVE ON TO 3553(A)

12  FACTORS AND OTHER THINGS LIKE THAT.  BUT I THINK JUST FOR THIS

13  PARTICULAR CASE, THOSE ARE THE SIGNIFICANT DISPUTES I HAVE.

14            THE COURT:  ALL RIGHT.  I'LL MOVE ON TO THE 3553.

15            MR. LANAHAN:  WELL, I THINK THE OTHER IS -- AND I --

16  AGAIN, I'M NOT HERE -- I DIDN'T SEE THE -- OBVIOUSLY, TRIALS

17  ARE A MUCH MORE EMOTIONAL EXPERIENCE; ONE DOES SEE WHAT PEOPLE

18  ARE -- AND IT'S A REAL IMPACT OF SEEING SOMETHING RATHER THAN

19  JUST READING.  BUT I HAVE TO SAY, IN LOOKING AT MR. SMITH'S

20  BACKGROUND, WELL, HE HAS A NUMBER -- HE DOES HAVE A NUMBER OF

21  PRIOR OFFENSES THAT DON'T SCORE, BUT THE REASON THEY DON'T

22  SCORE IS THAT THEY ARE OLD.

23        I MEAN, THIS IS SOMEONE WHO DID COME FROM A BACKGROUND --

24  AND WHETHER HE WAS A GANG MEMBER OR WHETHER HE WAS -- OR

25  WHETHER HE WAS AN ACCURATELY DOCUMENTED GANG MEMBER OR

1   WHATEVER, HE CAME FROM WHAT WAS A ROUGH PART OF THIS PARTICULAR

2   TOWN.

3           THE COURT:  SO LET ME ASK YOU ABOUT THAT.  WAS HE OR

4   WAS HE NOT A GANG MEMBER?  BECAUSE IN YOUR FACTUAL DISPUTES,

5   YOU TAKE ISSUE WITH THE FACT THAT THE PROBATION REPORT

6   MENTIONED HIS --

7           MR. LANAHAN:  IN SPEAKING WITH MR. SMITH, HE SAYS HE

8   WAS NOT A GANG MEMBER.  I'M NOT GOING TO SAY -- HE MAY BE A

9   DOCUMENTED GANG MEMBER.  HE'S SAYING HE ACTUALLY WAS NOT A GANG

10  MEMBER.  BUT I THINK ALSO -- BUT WHETHER HE WAS OR WHETHER HE

11  WASN'T 20 YEARS AGO, THERE REALLY IS NO INDICATION NOW THAT

12  THIS IS GANG ACTIVITY.  THIS IS -- IT'S ILLEGAL ACTIVITY, AND

13  I'M NOT SAYING IT IS GOOD.

14      BUT IT IS NOT -- BUT THIS IS SOMEONE WHO CAME UP FROM A

15  PARTICULARLY ROUGH PART OF TOWN.  AND WHEN HE WAS RELEASED BACK

16  IN 2000, HE WAS ESSENTIALLY OUT TEN YEARS.  HE DID OPERATE HIS

17  OWN BUSINESS.  I'M SURE THE GOVERNMENT SAID THIS MAY HAVE BEEN

18  A SHELL.  BUT WE DO HAVE IT WAS REGISTERED AS A BUSINESS AND

19  DID OPERATE FOR A NUMBER OF YEARS.  I DID INCLUDE THINGS WITH

20  IT TO SHOW THAT HE WAS REGULARLY EMPLOYED AND WAS USING THAT AS

21  A BUSINESS.

22      ALSO, I THINK IN LOOKING AT THE NATURE AND SCALE OF

23  THESE -- THE NATURE AND CIRCUMSTANCES OF THE OFFENSE, AGAIN, I

24  WAS HERE FOR THE SENTENCING, AND I DO REALIZE IT'S A SERIOUS

25  OFFENSE.  BUT, THERE ARE A NUMBER OF OTHER CASES LIKE THIS IN

1    THIS BUILDING, OF WHICH -- NEXT TO WHICH, THIS IS A FAIRLY

2    MINOR CASE.  AND THERE IS ONLY ONE PERSON BEING INVOLVED.  AND

3    THE NATURE AND CIRCUMSTANCES, I THINK, OF MR. SMITH, IN TERMS

4    OF HIS OTHER -- HE HAS SIGNIFICANT FAMILY CONNECTIONS.  HE HAS

5    INDICATED THERE WERE LETTERS FROM HIS DAUGHTERS.  HE HAS

6    PROVIDED FOR THEM.

7         IN MANY WAYS, HE HAS DONE -- THERE ARE FACTORS, I THINK,

8    IN -- BUT ULTIMATELY, WHAT IT COMES DOWN TO IS, I DON'T KNOW

9    WHAT GUIDELINE RANGE YOU'RE GOING TO IMPOSE, BUT 30 YEARS IS AN

10   AWFUL LONG TIME FOR THIS CASE.  I THINK MANDATORY MINIMUM IS --

11   I MEAN, MANDATORY MINIMUM IS A HARSH SENTENCE.  FIFTEEN YEARS

12   IS NOT A KISS.  IT'S A LONG TIME.

13        AND WHEN HE GETS OUT, HE'S GOING TO BE 73.  AND IT JUST

14   SEEMS THAT IN TERMS OF -- ULTIMATELY, PROPORTIONALITY, I THINK

15   IN SOME WAYS IS AN ISSUE -- IN LOOKING AT THIS CASE, I WAS

16   TRYING TO ANALOGIZE, OVER IN STATE COURT, WHAT WOULD THEY BE

17   DOING?

18             THE COURT:  DON'T DO THAT.

19             MR. LANAHAN:  WELL, OKAY, I'M NOT.  OKAY.

20             THE COURT:  DON'T DO THAT.

21             MR. LANAHAN:  OKAY.  I MEAN, IT COULD -- WELL, WE'RE

22   HERE, AS OPPOSED TO OVER THERE.  BUT NORMALLY, THIS IS THE KIND

23   OF CASE THAT WOULD NORMALLY GO OVER THERE.  AND I JUST THINK IN

24   LOOKING AT THE NATURE AND CIRCUMSTANCES OF THIS PARTICULAR

25   OFFENSE, GIVEN ITS SCOPE, GIVEN HOW LONG IT WENT ON, GIVEN WHAT

ELSE HE WAS DOING, WHAT OTHER FACTS, THAT HE WAS EMPLOYED IN

ANOTHER -- HE HAD OTHER FORMS OF EMPLOYMENT, OTHER FORMS OF

REVENUE, I WOULD BE ASKING, AND DO ASK, I THINK THAT A 15-YEAR

SENTENCE IS ULTIMATELY APPROPRIATE.  AND IT WILL SIGNIFICANTLY

DETER HIM.  IT WILL PUNISH HIM SIGNIFICANTLY.  AND I REMEMBER

LISTENING TO MORIAH SAYING, SHE WANTED TO MAKE SURE THAT HE

WOULD BE IN LONG ENOUGH SO THAT WHEN HE GOT OUT, HE WOULDN'T BE

ABLE TO HURT ANYONE ELSE.  AND I THINK THAT'S GOING TO BE A

SIGNIFICANT ENOUGH PERIOD OF TIME TO DO THAT.

          THE COURT:  LET ME ASK YOU SOMETHING, WHAT IS THE

MAXIMUM TERM THAT YOU WOULD THINK WOULD BE SUFFICIENT BUT NOT

GREATER THAN NECESSARY?

          MR. LANAHAN:  WELL --

          THE COURT:  WELL, THE LOW END WOULD BE 15 YEARS.

WHAT IS THE MAXIMUM TERM THAT YOU WOULD THINK WOULD BE

SUFFICIENT?

          MR. LANAHAN:  WELL, IF I WERE GOING TO DO IT?

          THE COURT:  THE MINIMUM MANDATORY, 15.

          MR. LANAHAN:  I KNOW, IT IS A MINIMUM MANDATORY.  I

WOULD SAY 20.  I MEAN, I THINK THAT IS GUIDELINE RANGE.

OBVIOUSLY, IF YOU FIND IT -- IT IS GOING TO BE 324, IF YOU

AGREE WITH EVERYTHING I SAY, THAT 324 IS THE MINIMUM, AND IF

YOU AGREE WITH WHAT THE GOVERNMENT IS SAYING, IT'S 360.  AND,

OBVIOUSLY, A RANGE WOULD BE BETWEEN -- YOU COULD SAY BETWEEN 15

AND 30.

1        THE COURT:  LET ME ASK YOU, WHAT IS THERE --

2   MR. LANAHAN, WHAT IS THERE IN THE RECORD THAT YOU CAN THINK OF

3   THAT WOULD WARRANT THE DEPARTURE FROM THE GUIDELINES?

4        I MEAN THE GUIDELINES, YOU KNOW, AS BEST AS I CAN TELL, IS

5   360.

6        MR. LANAHAN:  WELL, THE REASON I'M -- PROBABLY WHAT

7   I'M LOOKING AT IS, IT APPEARS -- THE GUIDELINES INCLUDE -- I

8   MEAN, WHETHER -- I'M ALSO GOING TO SAY, DOUBLE COUNTING, IT

9   DOES APPEARS, THOUGH, THERE ARE MANY INTER-RELATED FACTORS

10  THAT, IN THIS PARTICULAR CASE, ARE ADDING, AS LIKE FRAUD CASES,

11  YOU GET TWO, PLUS TWO, PLUS TWO, PLUS TWO, PLUS TWO.  AND SOME

12  OF THEM OVERLAP.  SOME APPEAR TO BE DUPLICATIVE.  THAT ISN'T

13  REALLY A BASIS FOR DEPARTURE BECAUSE THE GUIDELINES CONSIDER

14  IT.

15       BUT WHAT I'M SAYING IS THAT, IT IS REALLY MORE OF -- I'M

16  ASKING YOU TO SORT OF COMPARE THIS WITH SIMILAR TYPE OF CASES

17  THAT ARE GOING ON IN THIS BUILDING.  AND IN SORT OF

18  PROPORTIONALITY, LOOKING AT IT, SAYING, THERE WOULD BE CERTAIN

19  CASES WHERE, YOU'RE HAVING A LARGER SCOPE, AND YOU'RE HAVING A

20  LARGER, YOU KNOW, A MORE SOPHISTICATED OPERATION, WHATEVER YOU

21  WANT TO SAY, BUT THAT IS WHERE THE GUIDELINES WOULD REALLY BE

22  AND WERE INTENDED TO DO.

23       THIS IS A MUCH SMALLER SCALE.  AND THAT IN SOME WAYS,

24  WHERE THE -- FOR EXAMPLE, LIKE THE UNDUE INFLUENCE.  WHILE

25  UNDUE INFLUENCE IS INCREASING THE SENTENCE, BUT IT IS ALSO

1    INHERENT IN THE USE OF A MINOR, OR THE USE OF VIOLENCE, WHICH

2    WAS FOUND BY BOTH THE JURY IN CONVICTING HIM.  SO AGAIN, THERE

3    IS ANOTHER TWO-LEVELS THAT IS INCREASED BASED ON THAT.

4        THE USE OF THE COMPUTER WHILE IT WAS THERE, IT ISN'T

5    REALLY A MASSIVE COMPUTER OPERATION.  WE'RE NOT DEALING HERE

6    WITH A HUGE INTERNET TYPE OF OPERATION.

7        SO THAT IS WHERE I'M -- I CAN'T TELL YOU IT'S A DEPARTURE,

8    BUT WHAT I'M SAYING IS, THE TWO, PLUS TWO, PLUS TWO, PLUS TWO,

9    PLUS TWO IS REALLY OVERSTATING AND IN SOME WAYS DOUBLE COUNTING

10   THE OFFENSE IN THIS CASE.

11           THE COURT:  BUT YOU CONCEDE YOU CAN HAVE THIS OFFENSE

12   BASICALLY WITHOUT USING A COMPUTER, RIGHT?

13           MR. LANAHAN:  YOU CAN.

14           THE COURT:  AND I KNOW THAT BECAUSE I'VE TRIED CASES.

15           MR. LANAHAN:  NO, IT'S BEEN DONE.  BUT I'M NOT BEING

16   GLIB.  EVERYBODY IS ON A COMPUTER NOW.

17           THE COURT:  I DO HAVE A PROBLEM WITH THE COMMERCIAL

18   SEX ACT.  BECAUSE I'M NOT SURE IF YOU TRAFFIC CHILDREN FOR

19   SEXUAL PURPOSES WITHOUT HAVING A COMMERCIAL SEX ACT.  I THINK

20   THAT IS A LITTLE -- THAT IS A LITTLE TROUBLESOME.

21       AND I DO HAVE A LITTLE PROBLEM WITH THE UNDUE INFLUENCE

22   BECAUSE THAT DOES SEEM TO BE INHERENT IN TRAFFICKING MINORS.

23   SO I'M NOT SAYING I'M RULING IT OUT.  I'M JUST SAYING I CAN

24   UNDERSTAND YOUR CONCERN.  BUT CERTAINLY, THE USE OF A COMPUTER,

25   WHICH I RECALL VIVIDLY THE TAPE OF THE MINOR AND MR. SMITH

1  BEING IN THE ROOM, WHERE MR. SMITH IS USING THE COMPUTER AND

2  THE PHONE CALL COMES IN, AND THE MINOR ANSWERS THE PHONE, AND

3  HE IS ALL UPSET BECAUSE SHE ANSWERED THE WRONG PHONE, AS I

4  RECALL.  SO BUT, I'M CERTAINLY WILLING TO HEAR ARGUMENT ON

5  THE -- HOW YOU CAN HAVE A -- HOW YOU CAN HAVE THIS OFFENSE

6  WITHOUT TRAFFICKING, OR WITHOUT BEING INVOLVED IN A COMMERCIAL

7  SEX ACT.

8      AND I GUESS UNDUE INFLUENCE, I SUPPOSE -- I MEAN, I GUESS

9  THERE ARE ONLY TWO WAYS TO DO THIS SORT OF CRIME.  ONE IS YOU

10  EITHER UNDULY INFLUENCE THE MINOR; OR TWO, YOU THREATEN THE

11  MINOR WITH FORCE.  I GUESS YOU COULD SAY, THE MINOR COULD

12  ENGAGE IN IT CONSENSUALLY, BUT THAT FLIES IN THE FACE OF THE

13  WHOLE -- THE FACT THAT WE DON'T BELIEVE THAT MINORS HAVE THE

14  ABILITY TO CONSENT.  OF COURSE, THAT KIND OF FLIES IN THE FACE

15  OF SOME OF THE NINTH CIRCUIT DECISIONS THAT WE HAVE REGARDING

16  STATUTORY RAPE, ETC.

17      MR. LANAHAN:  NOW WE'RE GETTING INTO -- I KNOW THAT

18  IN TENS OF AGGRAVATED FELONY, THAT IS A -- YES.

19      THE COURT:  THAT IS A WHOLE --

20      MR. LANAHAN:  THAT IS A WHOLE DIFFERENT --

21      THE COURT:  MS. SERANO, LET ME ASK YOU, TELL ME ABOUT

22  THIS ENHANCEMENT FOR COMMERCIAL SEX ACT.  TELL ME ABOUT THAT

23  BECAUSE I'M A LITTLE TROUBLED.

24      MS. SERANO:  BY WAY OF BACKGROUND, MR. SMITH IS

25  CONVICTED OF TWO CRIMES THAT ARE PROHIBITED BY THE STATUTE.

1    THE FIRST ONE IS, USING FORCE, FRAUD, OR COERCION OF ANYBODY,

2    REGARDLESS OF AGE; AND THE SECOND ONE WAS, THE USE OF A MINOR.

3    SO TWO DIFFERENT CRIMES, THE JURY CAME BACK WITH A SPECIAL

4    VERDICT FORM, AND THAT'S WHY WE STARTED THE OFFENSE LEVEL 34.

5        TO ANSWER YOUR HONOR'S QUESTION, THE STATUTE CRIMINALIZES

6    -- IF YOU TURN TO 1591, IT CRIMINALIZES THE HARBORING,

7    MAINTAINING, OBTAINING, PROVIDING OF THE PERSON.

8              THE COURT:  FOR?

9              MS. SERANO:  FOR THE USE OF A COMMERCIAL SEX ACT.

10   COMMERCIAL SEX ACT DOESN'T NECESSARILY HAVE TO OCCUR.  IT IS

11   THE ACT OF PROCURING, HARBORING, PROVIDING, OBTAINING, AND

12   MAINTAINING.  IN FACT, I TRIED A CASE BEFORE JUDGE WHELAN LAST

13   YEAR, WHERE THAT WAS THE CASE.  AND THE DEFENDANTS TOOK THE

14   GIRL, THEY POSTED HER ON-LINE, THEY MADE HER WALK THE LOCAL

15   TRACK, WHERE SHE WAS -- WHERE SHE WAS APPREHENDED.  SHE DIDN'T

16   COMMIT A SINGLE COMMERCIAL SEX ACT.  SHE WAS ABLE TO ESCAPE.

17       BUT THIS -- BUT THE INDIVIDUALS WHO WENT TO TRIAL WERE

18   CONVICTED OF THIS OFFENSE BECAUSE OF THE VERBS THAT ARE USED IN

19   THE STATUTE, THE OBTAINING, MAINTAINING, PROVIDING, HARBORING,

20   THAT SORT -- ENTICING, COERCING.

21             THE COURT:  BUT DON'T THEY ALL ENTAIL COMMERCIAL SEX

22   ACT?

23             MS. SERANO:  MOST TYPICAL CASES DO.  BUT WHAT I'M

24   SAYING IS, YOU CAN VIOLATE THIS STATUTE AND NOT HAVE THAT

25   OFFENSE CHARACTERISTIC APPLY BECAUSE A COMMERCIAL SEX ACT

1   DOESN'T NEED TO HAVE TO HAPPEN.  THE PERSON DOESN'T HAVE TO

2   HAVE SEX IN EXCHANGE FOR MONEY IN ORDER FOR A PERSON TO BE

3   GUILTY OF THIS OFFENSE.

4       SO THE GUIDELINES ADEQUATELY INCREASE THE OFFENSE LEVEL IF

5   SEX ACTS, COMMERCIAL SEX ACTS OCCUR.  AND YOUR HONOR --

6           THE COURT:  I SEE, OKAY.  I WAS JUST GOING TO LOOK AT

7   THAT.  SO WHAT YOU'RE SAYING IS, THE GUIDELINE INCREASE IS FOR

8   A COMMERCIAL SEX ACT ACTUALLY OCCURRING?

9           MS. SERANO:  CORRECT.

10          THE COURT:  OKAY, GOT IT.

11          MS. SERANO:  SO IN THIS CASE, THE TRIAL TESTIMONY OF

12  THE VICTIM WAS THAT SHE, IN FACT, DID ENGAGE IN COMMERCIAL SEX

13  ACTS, AND QUITE -- IN FACT, MANY OF THEM OVER A PERIOD OF TIME,

14  AND ALL THE MONEY WENT TO THIS DEFENDANT.  LIKEWISE, THE

15  INCREASE FOR -- OR THE UNDUE INFLUENCE INCREASE, AGAIN, THIS

16  DEFENDANT IS -- WAS CONVICTED OF USING FORCE, FRAUD, OR

17  COERCION AGAINST A PERSON.

18      THAT OFFENSE DOESN'T REQUIRE A SPECIFIC AGE.  SO THE --

19  THE INCREASE APPLIES, AND THERE IS A REBUTTAL PRESUMPTION THAT

20  IF THE PERSON IS TEN YEARS OLDER THAN THE PERSON, THEN THAT

21  INCREASE SHOULD BE INCLUDED.  AND THAT'S THE CASE.  MR. SMITH

22  IS --

23          THE COURT:  I'M SORRY, I DON'T MEAN TO CUT YOU OFF,

24  BUT I'M KIND OF LOST.  ARE YOU TALKING ABOUT THE UNDUE

25  INFLUENCE?

1        MS. SERANO:  THE UNDUE INFLUENCE, YES.  UNDER

2   2G1.3.2.

3        THE COURT:  ALL RIGHT.  OKAY.

4        MS. SERANO:  UNDER THE COMMENTARY NOTES, IT TALKS

5   ABOUT UNDUE INFLUENCE.  THERE IS A -- THE THIRD NOTE, IN A CASE

6   IN WHICH A PARTICIPANT IS TEN YEARS OLDER THAN THE MINOR, THERE

7   SHALL BE A REBUTTAL OF PRESUMPTION THAT B(2)(B) APPLIES.

8        THE COURT:  THERE IS NO QUESTION THAT THERE WAS UNDUE

9   INFLUENCE IN THIS CASE.

10       MS. SERANO:  ABSOLUTELY.  THERE WAS, IN FACT, FORCE,

11  FRAUD, AND COERCION USED.  SO REGARDLESS OF WHETHER THE VICTIM

12  IN THIS CASE WAS A MINOR, IF THE VICTIM WAS 21 YEARS OLD IN

13  THIS CASE, PRESUMABLY THIS MIGHT APPLY.  BUT BECAUSE WE HAVE A

14  MINOR IN THIS CASE, AND THE DEFENDANT IS OVER TWICE HER AGE,

15  THAT THIS IS NOT A 35-YEAR-OLD WOMAN THAT HE DID THIS TO, THIS

16  WAS A THEN -- JUST TURNED 17 YEARS OLD TO GET HER INVOLVED.

17    WITH REGARD TO THE ROLE ARGUMENT THAT COUNSEL MAKES, I

18  THINK YOUR HONOR MAY RECALL THE TESTIMONY OF OTHER WOMEN

19  WORKING FOR THIS DEFENDANT.  AND, IN FACT, IF YOUR HONOR, AT

20  THE END OF THIS SENTENCING ARGUMENT --

21       THE COURT:  I'M SORRY, REFRESH MY RECOLLECTION ON

22  THAT.

23       MS. SERANO:  THE VICTIM TESTIFIED AT TRIAL THAT WHEN

24  SHE WAS FIRST BROUGHT ON BY MR. SMITH, THERE WAS ANOTHER WOMAN

25  BY THE NAME OF MICHELLE SANCHEZ --

1        THE COURT:  RIGHT, AND SHE GOT KNOCKED OUT AS I

2   RECALL.

3        MS. SERANO:  SHE GOT KNOCKED OUT.

4        THE COURT:  I REMEMBER THAT.

5        MS. SERANO:  AND THAT WAS A WOMAN THAT WAS WORKING IN

6   THE SAME CAPACITY FOR MR. SMITH.  AND THAT IS WHEN THE VICTIM'S

7   QUOTA INCREASED, ETC., ETC.

8        WE ALSO HEARD, YOUR HONOR MAY RECALL, THAT THE GOVERNMENT

9   ATTEMPTED TO OR WANTED TO BRING IN 404(B) EVIDENCE RELATED TO

10  THE DEFENDANT'S CONDUCT TOWARD ANOTHER WOMAN WHO IS HERE TODAY.

11  HER NAME IS BONNIE HIGGINS.  AND SHE IS SITTING IN THE BACK.

12  AND SHE WOULD LIKE TO SPEAK TO THE COURT AT THE APPROPRIATE

13  TIME AS A VICTIM OF THIS DEFENDANT.  AND SHE WILL TELL YOU, AND

14  I CERTAINLY DON'T WANT TO TAKE HER WORDS AWAY, BUT THAT SHE WAS

15  FORCED TO DO THE SAME THING.  SO TO THE EXTENT THE ARGUMENT IS,

16  WELL, HE ONLY HAD ONE PERSON, IT WAS JUST THIS ONE MINOR, THAT

17  IS ABSOLUTELY INCORRECT.

18       IN ADDITION, IF YOUR HONOR RECALLS, IT'S ACTUALLY LISTED

19  IN THE PRE-SENTENCE REPORT, THE DEFENDANT'S PRIOR OFFENSE,

20  THERE WAS INDICATION THAT THE PRIOR CONVICTION FOR --

21       THE COURT:  YOU MEAN THE KIDNAPPING?

22       MS. SERANO:  YES.

23       THE COURT:  AND THE CONVICTION?

24       MS. SERANO:  YES.

25       THE COURT:  I REMEMBER THAT PRETTY CLEARLY.

1        MS. SERANO:  HE WAS ALSO CHARGED WITH A VARIETY OF

2   OTHER CHARGES.  AND HE PLED GUILTY TO THE -- I THINK IT WAS THE

3   CHILD INTERFERENCE OR SOMETHING LIKE THAT.

4        THE COURT:  FALSE IMPRISONMENT I THINK IT WAS, RIGHT?

5        MR. LANAHAN:  IT WAS CHILD ABDUCTION.

6        MS. SERANO:  IT WAS CHILD ABDUCTION, BUT YOUR

7   HONOR --

8        THE COURT:  IT DID NOT INVOLVE THE PROSTITUTION

9   ELEMENT?

10        MS. SERANO:  HE DID NOT PLEAD TO THAT.  BUT THERE IS

11   AT LEAST AN INFERENCE BASED ON THE PRELIMINARY HEARING

12   TRANSCRIPT, AND THERE IS ALSO RECOUNTED IN THE PRE-SENTENCE

13   REPORT, FROM THE CHARGING DOCUMENTS, THAT THIS DEFENDANT, ALONG

14   WITH FOUR OTHERS, WERE CHARGED WITH INVOLVING THIS GIRL, I

15   THINK SHE WAS 13 AT THE TIME, FOR THE PURPOSE OF PROSTITUTION.

16     SO THIS IS NOT HIS FIRST RODEO AT THE END OF THE DAY.

17   THIS IS NOT THE ONLY PERSON.  THE VICTIM WILL TESTIFY BEFORE

18   YOUR HONOR THAT THE VICTIM WAS NOT THE ONLY PERSON WORKING FOR

19   MR. SMITH.  HE'S BEEN ENGAGED IN THIS TYPE OF CONDUCT FOR

20   YEARS.  AND SO CERTAINLY, HE'S -- HE'S DESERVING OF A ROLE

21   INCREASE FOR THAT.

22        THE COURT:  OKAY.

23        MS. SERANO:  SO WITH THAT, I THINK I ADDRESSED ALL OF

24   THE GUIDELINE ISSUES.  UNLESS YOUR HONOR HAS ANY QUESTIONS,

25   I'LL RESERVE THE REST OF MY ARGUMENT, AND I WOULD ASK IF YOUR

1    HONOR COULD -- IF I COULD RESERVE SOME TIME FOR MS. HIGGINS TO

2    TALK TO THE COURT.

3            THE COURT:  OKAY.  WELL, WHY DON'T WE DO THAT.

4    MR. LANAHAN, WHY DON'T YOU AND MR. SMITH SIT DOWN.

5            MR. LANAHAN:  OKAY.

6            THE COURT:  I KNOW I HEARD FROM THE VICTIM IN THIS

7    CASE BEFORE.

8            MS. SERANO:  YOU DID.  AND I DID FILE HER VICTIM

9    IMPACT STATEMENT AS WELL.

10           THE COURT:  RIGHT.  SO I UNDERSTAND SHE -- I HEARD

11   THROUGH MY COURTROOM DEPUTY, SHE WANTED TO TALK TO ME AGAIN.

12   BUT I DON'T THINK WE NEED TO GO THROUGH ALL OF THIS AGAIN.  NO

13   DISRESPECT.  I'VE ALREADY HEARD THOSE -- MAYBE, I COULD HEAR

14   HER FOR JUST A FEW MINUTES, AND I BELIEVE YOU SAID THERE WAS

15   ANOTHER VICTIM WHO WAS INVOLVED, WHO WANTED TO SPEAK?

16           MS. SERANO:  BONNIE HIGGINS, WHO IS THE YOUNG LADY IN

17   THE WHITE JACKET.

18           THE COURT:  WHY DON'T YOU COME UP HERE BECAUSE YOU'RE

19   GOING TO HAVE TO USE THE MICROPHONE, SO THAT WE CAN HEAR YOU

20   AND KNOW WHO YOU ARE.  THAT'S FINE.  WHEREVER YOU FEEL

21   COMFORTABLE.

22      WHAT IS YOUR NAME?

23           MS. HIGGINS:  MY NAME IS BONNIE HIGGINS.

24           THE COURT:  HOW OLD ARE YOU?

25           MS. HIGGINS:  I'M 32 YEARS OLD.  I WAS BORN AND

1  RAISED HERE IN SAN DIEGO.  WHEN I MET MAURICE SMITH, I WAS 24

2  YEARS OLD.  I HAD JUST FINISHED SERVING AN EIGHT-YEAR

3  INCARCERATION.  I WAS LOCKED UP AT THE AGE OF 16.  I WAS ON

4  PAROLE.  I WAS VERY ALONE IN THE WORLD, AND I WAS HAVING A VERY

5  DIFFICULT TIME TRANSITIONING.  BUT I WAS DETERMINED TO LIVE A

6  GOOD LIFE AND TO COMPLETE MY PAROLE AND DO ALL OF THE POSITIVE

7  THINGS TO BE A GOOD CITIZEN.

8      BUT I WAS VERY ALONE AND SCARED, AND I WAS IN A LOT OF

9  TURMOIL.  AND WHEN I MET HIM, HE RECOGNIZED THAT.  AND I

10 THOUGHT THAT HE WAS HELPING ME, AND HE WAS VERY NICE TO ME, AND

11 REALLY, HE WAS EXPLOITING MY VULNERABILITY.

12      THE COURT:  DID HE TELL YOU HE LOVED YOU?

13      MS. HIGGINS:  YEAH, HE DID.  AND HE EVEN DROVE ME TO

14 MY PAROLE OFFICER ONE TIME BECAUSE HE DIDN'T WANT ME TO GET IN

15 TROUBLE.  AND AT THE SAME TIME, HE CREATED SITUATIONS AND

16 CIRCUMSTANCES TO SEPARATE ME FROM MY NETWORK, MY SUPPORT

17 SYSTEM, AND MY FAMILY.

18      AFTER A WHILE, HE CAME TO MY MOM'S HOUSE, WHEN SHE WAS AT

19 A BIBLE STUDY ONE NIGHT, WITH TWO OTHER MEN AND TOOK ME TO A

20 TRUCK -- TO A HOTEL.  OVER TIME -- IMMEDIATELY AFTER THAT, HE

21 GAVE MY MOM A LOT OF MONEY SO SHE WOULDN'T FILE A MISSING

22 PERSON'S REPORT WITH THE POLICE.

23      THE COURT:  WAIT, YOUR MOM WAS AT A BIBLE STUDY, AND

24 MR. SMITH WAS GIVING HER MONEY SO THAT SHE WOULDN'T FILE A

25 MISSING PERSON'S REPORT?

1          MS. HIGGINS:  THAT'S CORRECT, YOUR HONOR.

2          THE COURT:  OKAY.

3          MS. HIGGINS:  AFTER THAT, HE FORCED ME TO ENGAGE IN

4    ACTS OF PROSTITUTION.  I DON'T WANT TO TALK ABOUT IT IN DEPTH.

5    THAT'S NOT WHY I'M HERE.  I JUST NEED TO ADDRESS THAT HE'S A

6    VERY DANGEROUS MAN.  HE'S VERY INTELLIGENT.  HE'S CHARMING.  HE

7    IS INCREDIBLY INTELLIGENT, WAY SMARTER THAN ME.  AND HE IS SO

8    MANIPULATIVE.  HE'S SO GOOD AT MAKING PEOPLE THINK THAT HE'S

9    THE NICE GUY, WHO REALLY CARES AND REALLY WANTS TO HELP UNTIL

10   HE'S PUNCHING YOU AND KNOCKING YOUR TEETH OUT, OR BREAKING

11   RIBS, OR KICKING YOU IN THE FACE, OR SMASHING YOUR HEAD INTO

12   THE WALL.

13        HE EVEN THREW MY BABY, MY DAUGHTER, ACROSS THE ROOM IN HER

14   STROLLER WHEN SHE WAS JUST A BABY.  ANY TIME YOU DIDN'T DO WHAT

15   HE WANTED, IT WAS VIOLENCE, IT WAS TORTURE, IT WAS EXHAUSTION,

16   IT WAS SCREAMING.  IT WAS LIKE BEING A POW, NO SLEEP, NO FOOD,

17   ALWAYS BEING YELLED AT, ALWAYS BEING THREATENED, ALWAYS BEING

18   HIT.  THERE WAS NOT ONE MOMENT OF PEACE IN MY LIFE FOR FIVE

19   YEARS.

20          THE COURT:  HOW DID YOU GET OUT?

21          MS. HIGGINS:  I ESCAPED.  I HAVE A GOOD FRIEND WHO

22   LOVED ME, AND SHE AND HER HUSBAND HELPED ME ESCAPE AND HID ME

23   FROM HIM.  AND THEY GAVE ME MONEY SO I COULD GET AWAY.  AND I

24   DID.  AND I WENT 3,000 MILES FROM MY HOME, AND I LEFT MY

25   DAUGHTER WITH MY SISTER BECAUSE SHE HAS A GUN, SO I KNOW SHE

1   CAN PROTECT HER.  I COULDN'T USE MY OWN NAME.  I LIVED IN

2   HIDING.  MY DAUGHTER'S BEEN GOING THROUGH TRAUMA THERAPY.  SHE

3   IS FIVE YEARS OLD NOW.  SHE STILL REMEMBERS THINGS THAT

4   HAPPENED, AND SHE TALKS ABOUT THEM SOMETIMES.  SHE DOESN'T

5   REALLY UNDERSTAND, AND I'M GLAD BUT -- I CAN'T EVEN TAKE CARE

6   OF HER BECAUSE I'M STILL DEALING WITH THE TRAUMA THAT I

7   SUFFERED.

8            THE COURT:  ALL RIGHT.  I DON'T MEAN TO CUT YOU OFF,

9   BUT I DO HAVE TO GET MOVING.  SO ANYTHING ELSE YOU WANT TO SAY?

10           MS. HIGGINS:  JUST THAT HE'S DANGEROUS, AND HE WILL

11  NEVER STOP DOING THIS TO OTHER WOMEN.  HE COULD BE 60, HE COULD

12  BE 70, HE'LL STILL TRY.  AND HE'S SO SMART, THAT HE'LL SUCCEED.

13           THE COURT:  THANK YOU.

14           MS. HIGGINS:  THANK YOU.

15           THE COURT:  I BELIEVE THAT THE MINOR WANTED TO

16  ADDRESS THE COURT AGAIN; IS THAT RIGHT?

17           MS. SERANO:  YES.  AND AS WELL MS. HIGGINS' SISTER,

18  WHO IS CARING FOR BONNIE'S DAUGHTER.

19           THE COURT:  NO.  I JUST CAN'T HEAR FROM EVERYONE.

20  I'M JUST GOING TO HEAR FROM THE MINOR AGAIN, AND THEN WE'LL

21  MOVE ON, OKAY.

22       SO WHY DON'T YOU COME ON UP.  I SAW YOU CARRYING YOUR

23  BABY.  IT LOOKS LIKE EVERYTHING WENT OKAY.

24           MS. SMITH:  NO, IT DIDN'T.

25           THE COURT:  I'M SORRY.  OKAY.

1          MS. SMITH:  THAT'S WHAT I WANT TO TALK TO YOU ABOUT.

2          THE COURT:  OKAY.

3          MS. SMITH:  SO I DID HAVE A HEALTHY, HAPPY LITTLE

4    BOY.  BUT I WAS IN LABOR THREE DAYS.  FROM SATURDAY, AT 4:00 IN

5    THE AFTERNOON, UNTIL TUESDAY, AT 12:00 IN THE MORNING.  IT MAY

6    NOT SOUND LIKE IT'S NOT YOUR PROBLEM OR YOUR CONCERN --

7          THE COURT:  YOU'RE RIGHT.  IT'S NOT MY PROBLEM.  IT

8    IS NOT MY CONCERN.  IT WAS YOURS.

9          MS. SMITH:  YES.  UNFORTUNATELY, THE REASON FOR THAT

10   IS, I HAD A LINING OF SCAR TISSUE ON THE INSIDE OF MY UTERUS

11   AND ON THE OUTSIDE OF MY CERVIX THAT WAS NOT ALLOWING ME TO

12   DILATE, AND MY SON ALMOST DIED BECAUSE OF THE PROCEDURES THAT

13   HE FORCED ME TO HAVE.

14         THE COURT:  YOU'RE SAYING THE ABORTION?

15         MS. SMITH:  THE ABORTION.  I HAD NO WANT FOR THAT.

16   THAT IS NOT OKAY WITH ME.  YOU DON'T KILL SOMETHING BEFORE IT

17   HAS THE CHANCE TO GET ITSELF KILLED.

18         THE COURT:  ALL RIGHT.

19         MS. SMITH:  SO I LOST THREE CHILDREN TO THAT

20   PROCEDURE.  I WAS PREGNANT WITH TWINS BEFORE I GOT PREGNANT

21   WITH MY SON.  AND I LOST THOSE BABIES DUE TO THE SCAR TISSUE.

22         THE COURT:  I SEE.

23         MS. SMITH:  AND I JUST -- I REALLY THOUGHT THAT YOU

24   NEEDED TO KNOW THAT.

25         THE COURT:  THANK YOU.  I APPRECIATE IT.

1          MS. SMITH:  YES.

2          THE COURT:  MR. SMITH, YOU HAVE A RIGHT TO ADDRESS

3   THE COURT IF YOU WISH TO DO SO.  NOW IS THE TIME TO DO IT.

4   ANYTHING YOU WISH TO SAY, SIR?

5          THE DEFENDANT:  YES, SIR.

6          THE COURT:  PLEASE SPEAK INTO THE MICROPHONE.

7          THE DEFENDANT:  YOU KNOW, YOUR HONOR, I KNOW THE

8   COURT HAS HEARD A LOT OF INFORMATION.  AND I -- I JUST WANT THE

9   COURT TO UNDERSTAND, ANY TIME I'VE EVER DONE SOMETHING WRONG,

10  YOUR HONOR, I'VE SIGNED A DEAL AND TAKEN FULL RESPONSIBILITY

11  FOR WHAT I'VE DONE.  I CAN'T GET INTO ANY FACTUAL THINGS RIGHT

12  NOW, I MEAN, BUT, I'M JUST HURT, YOUR HONOR.  AND I'M NOT --

13  NOT -- THE THING THAT -- I MEAN, I'M HEARING THINGS, AND I'M

14  SEEING PEOPLE THAT CAN'T LOOK AT ME.

15    AND IT HURTS ME BECAUSE THERE HAVE BEEN A LOT OF THINGS

16  THAT ARE SAID THAT IS REALLY HARD FOR ME TO LISTEN TO, YOUR

17  HONOR.  AND I KNOW -- I KNOW IT'S NOT GOING TO CHANGE THE

18  OUTCOME OF THIS OR ANYTHING LIKE THAT.  BUT, YOU KNOW, I JUST

19  WISH PEOPLE -- AND I'M GOING TO SAY THIS AND THERE IS NO

20  MANIPULATION IN THIS, YOUR HONOR, I JUST WISH PEOPLE WOULD TELL

21  THE TRUTH.  I REALLY WISH THE TRUTH WOULD COME OUT.

22          THE COURT:  LET ME ASK YOU SOME, MR. SMITH.  THE

23  TRUTH WOULD COME OUT, WHAT IS THE TRUTH?  TELL ME WHAT THE

24  TRUTH IS.

25          THE DEFENDANT:  WELL, I MEAN, MS. HIGGINS JUST GOT UP

1   HERE, AND I REALLY THOUGHT THAT WE HAD A DECENT RELATIONSHIP.

2   AND THE FORCE, AND HAVING TO HIDE, AND THINGS LIKE THIS, YOUR

3   HONOR --

4           THE COURT:  LET'S ASSUME THAT I DISREGARD

5   MS. HIGGINS, WHAT MS. HIGGINS HAS SAID, LET'S ASSUME I

6   DISREGARD THAT.

7           THE DEFENDANT:  YES, SIR.

8           THE COURT:  SO NOW WHAT?

9           THE DEFENDANT:  YOU KNOW, ME TELLING YOU THE TRUTH,

10  YOUR HONOR -- BASICALLY WHAT I WOULD SAY IS THIS:  THESE

11  ALLEGATIONS AND THE WAY THEY'RE BEING SAID, DID NOT HAPPEN.

12  I -- I DID NOT FORCE ANYONE TO DO SOMETHING.  I DID NOT PUNCH

13  ANYONE IN THEIR FACE, FROM MICHELLE SANCHEZ AND MICHELLE

14  CURTIS, I REALLY WISH AT THE TIME I COULD HAVE BROUGHT HER AS A

15  WITNESS.  SHE WAS WILLING.  SHE WAS IN DRUG REHAB.

16      ONCE AGAIN, THERE WERE ATTORNEY ISSUES.  MY ATTORNEY

17  WASN'T PROPERLY PREPARED.  AND HE DIDN'T GO OUT AND GET THESE

18  PEOPLE TO COME TESTIFY OVER THINGS THAT NEVER HAPPENED.  SO THE

19  VIOLENCE --

20          THE COURT:  CAN I ASK A QUESTION.  THE MINOR THAT

21  TESTIFIED IN THIS CASE, DID SHE HAVE AN ABORTION?

22          THE DEFENDANT:  YES, SHE DID.

23          THE COURT:  DID YOU TAKE HER TO PLANNED PARENTHOOD TO

24  HAVE AN ABORTION?

25          THE DEFENDANT:  YES, SIR, I DID.  DID I SCHEDULE IT?

```
 1   NO, SIR, I DIDN'T.  SHE SCHEDULED IT.  SHE TOLD ME THE DATE.  I

 2   TOOK HER.  I WAS THERE TO SUPPORT HER, AS ONE OF THE NURSES

 3   SAID, I WAS THERE TO SUPPORT.  I WAITED OUTSIDE.  I DID NOT GO

 4   IN BECAUSE YOU CAN'T GO IN.  I WAITED OUTSIDE.  I WAS THERE FOR

 5   HER.  I WAITED ON HER HAND AND FOOT ONCE THE PROCEDURE WAS

 6   DONE.  THERE WAS NO FORCE OR ANY, YOU HAVE TO DO ANYTHING.

 7           THE COURT:  WELL, I'M NOT GOING TO ASK YOU ANY

 8   QUESTIONS ABOUT THE ACTUAL OFFENSE BECAUSE MAYBE YOU WISH TO

 9   APPEAL, AND YOU MAY -- WHO KNOWS, IT MAY GET REVERSED, AND YOU

10   MAY COME BACK, AND I WOULDN'T WANT YOU TO ADMIT ANY OF THE

11   FACTUAL ELEMENTS OF THE OFFENSE.

12       ALTHOUGH, I CAN'T HELP BUT SAY THAT I HAVE LOTS OF

13   QUESTIONS.  NOW TELL ME, WHAT ELSE DO YOU WANT ME TO KNOW

14   BEFORE I IMPOSE SENTENCE?

15           THE DEFENDANT:  SIR, I -- ANYBODY THAT KNOWS ME, AND

16   HAS BEEN AROUND ME FOR A LONG PERIOD OF TIME, INCLUDING SOME OF

17   THE NAMES THAT WERE MENTIONED HERE, PEOPLE I PUNCHED, DID NOT

18   SAY THESE THINGS ABOUT ME.  I'M NOT A VIOLENT PERSON UNLESS I'M

19   PUSHED, AND THAT IS NOT GOING TO BE BY A WOMAN.  THAT WOULD

20   HAVE TO BE BY A MAN.

21       IF YOUR HONOR LOOKS AT MY INCARCERATION, I'VE BEEN IN

22   PRISON ONCE, AND IT WASN'T A NICE EXPERIENCE.  BUT I GOT

23   THROUGH PRISON WITHOUT ONE FIGHT.  I'VE BEEN INCARCERATED NOW

24   FOR OVER A YEAR.  I HAVEN'T HAD ONE FIGHT OR ALTERCATION.

25   THERE IS NOT ANYTHING THAT HAS COME TO THIS COURT TO SHOW ANY
```

1    TYPE OF VIOLENT BEHAVIOR OR ANYTHING OF THAT NATURE.  THAT IS

2    NOT ME.  I HAVE THREE BEAUTIFUL DAUGHTERS, YOU KNOW.  AND ONE

3    OF THEM -- I CAN'T GET INTO THE FACTS, I'M SORRY.  BUT THE TWO

4    THAT ARE ADULTS CAN ATTEST TO ONE THING; I DON'T SPANK MY

5    CHILDREN.  I HAVE NOT THROWN THEM ACROSS THE ROOM.  I HAVE TWO

6    OTHER DAUGHTERS' MOMS.  ONE OF THEM WROTE A LETTER IN SUPPORT

7    OF ME.  AND THE OTHER ONE, YOU KNOW, SHE'S NOT DOING SO WELL.

8    BUT, YOU KNOW, NEVER HAD ANY OF THESE PROBLEMS WITH TWO OTHER

9    DAUGHTERS THAT I'VE BEEN A PART OF THEIR LIVES.  AND THEY'RE

10    BOTH 19 YEARS OLD.  AND THEY CAN ONLY TELL YOU ABOUT HOW I'VE

11    TRIED TO PUSH THEM TO GET AN EDUCATION.

12          THE COURT:  I READ THEIR LETTERS.

13          THE DEFENDANT:  HOW I'VE TRIED TO -- YOU KNOW, NOT

14    HAVE THEM DO THINGS THAT, YOU KNOW, THAT I EXPERIENCED.  AND

15    I'VE NEVER BEEN INTO DRUGS OR ANYTHING LIKE THAT, BUT JUST, YOU

16    KNOW, STREET THINGS THAT KIDS FIND ALLURING, I'VE ALWAYS TRIED

17    TO DETER THEM FROM DOING THAT AND TELL THEM, BE RESPONSIBLE AND

18    BE GOOD PEOPLE.

19      YOU KNOW, EVERYONE IN HERE THAT KNOWS ME, THEY KNOW THAT I

20    HAVE GIVEN THEM AND -- YOU KNOW, THAT'S WHY IT HURTS ME, YOUR

21    HONOR, AND I'M ALMOST IN TEARS BECAUSE IT HURTS ME.  I'VE

22    REALLY TRIED TO GIVE PEOPLE ALL OF MYSELF.  I'M NOT SITTING UP

23    HERE SAYING I'M THE MOST INNOCENT PERSON IN THE WORLD.  BUT

24    I'VE BEEN THERE FOR PEOPLE.  WITH MS. HIGGINS, WAS IN FLORIDA

25    WHEN SHE SAID THAT SHE HAD TO RUN AND ESCAPE.  SHE ACTUALLY

1    SIGNED CUSTODY OVER TO HER DAUGHTER.  THERE WAS NO RUNNING

2    THERE.  SHE TOLD ME SHE HAD AN ILLNESS, AND SHE WANTED ME TO

3    HAVE CUSTODY OF THE DAUGHTER.  THOSE ARE IN DOCUMENTED

4    TRANSCRIPTS THAT WOULD HAPPEN IN FAMILY COURT.

5         ALL I'M SAYING IS, MY ATTORNEY WASN'T PROPERLY PREPARED TO

6    SHOW THE COURT A LOT OF FACTUAL EVIDENCE THAT WOULD SHOW YOU,

7    I'M NOT THE PERSON THAT THE PROSECUTOR AND THESE PEOPLE ARE

8    MAKING ME OUT TO BE.

9         MAYBE I SPEAK PRETTY WELL, BUT I CAN ATTEST THAT TO MY

10   MOM, WHO SPENT COUNTLESS HOURS SITTING THERE WITH ME AND MY

11   BROTHERS, TEACHING --

12            THE COURT:  SHE WENT THROUGH -- THE WHOLE TRIAL, SHE

13   HAS BEEN SITTING THERE.  SHE SAT THROUGH THE WHOLE TRIAL.  SHE

14   IS THERE NOW.

15            THE DEFENDANT:  YOUR HONOR, I LOVE HER WITH ALL MY

16   HEART.  SHE MEANS THE WORLD TO ME.  AND SHE RAISED ME TO BE A

17   DECENT PERSON.  YOU KNOW, I DON'T EVEN USE THE TERM "BITCH."

18   ANY OF THE THINGS THAT MOST CONSIDERED PIMPS WOULD BE DOING, I

19   DON'T DO.  I DON'T DISRESPECT WOMEN BECAUSE OF MY MOM.  I DON'T

20   USE THOSE TERMS OR ANYTHING LIKE THAT, YOUR HONOR.

21        AND ALL I'M SAYING IS THIS:  I'VE BEEN IN THIS COMMUNITY.

22   I'VE WORKED AS A WINDOW CLEANER, AND I LOVE MY JOB.  AND THERE

23   ARE A LOT OF PEOPLE THAT CAN ATTEST TO THAT.  I'VE BEEN IN

24   SEVERAL HOMES OF PEOPLE, EVEN JUDGES.  I'VE DONE THEIR WINDOWS

25   AND STUFF.  I'M JUST NOT THE PERSON THAT I'VE BEEN PAINTED OUT

1   TO BE.

2        AND I JUST WANT YOUR HONOR TO KNOW THAT, YOU KNOW, I GIVE

3   FREELY.  I GIVE FREELY TO ALL PEOPLE.  AND I'M NOT MAD.  YOU

4   HEARD IN THAT CONVERSATION, YOUR HONOR, YOU HEARD ME SAY, I'M

5   NOT UPSET, IT IS OKAY.  I MEAN, THE TRUTH WILL COME OUT.  AND I

6   JUST -- I JUST ASK THAT EVERYONE JUST TELL THE TRUTH.  BECAUSE,

7   YOU KNOW, I THINK THIS HAS GOTTEN REALLY OUT OF HAND.

8        THE COURT:  WHY DO YOU THINK THESE TWO YOUNG LADIES

9   WOULD LIE IF YOU'RE TELLING ME THEY'RE NOT TELLING THE TRUTH?

10        THE DEFENDANT:  WHAT DIDN'T COME OUT, I HAVE A

11   FIVE-YEAR-OLD DAUGHTER THAT YOU JUST HEARD ABOUT.  AND THERE

12   WAS A PLOT FOR ME TO BE CAUGHT UP IN PIMPING ALLEGATIONS SO

13   THAT MY -- I WOULDN'T HAVE CUSTODIAL RIGHTS TO MY CHILD.  AND,

14   YOUR HONOR, THE E-MAIL THAT WAS SHOWN, THAT WAS FORWARDED, ONCE

15   AGAIN, I'M GETTING INTO FACTUAL -- I DON'T KNOW IF YOU WANT TO

16   HEAR THAT OR IF I CAN EVEN DO THAT.

17        THE COURT:  WHAT I'M TRYING TO FIND OUT IS, WHY THESE

18   TWO LADIES WOULD WANT TO LIE.  THEY TOOK AN OATH.  THEY

19   TESTIFIED.  ONE OF THEM TOOK AN OATH; THE OTHER ONE DIDN'T TAKE

20   AN OATH.  BUT I'VE TOLD YOU, FOR PURPOSES OF SENTENCING, I'M

21   NOT GOING TO COUNT THAT.  SO WHY WOULD THE LYING GO ON?  WHAT

22   IS IN IT FOR HER?

23        THE DEFENDANT:  WELL, YOUR HONOR, THE PERSON THAT HAS

24   CUSTODY OF MY CHILD, MY FIVE-YEAR-OLD CHILD, IS THE ONE THAT

25   SHE CALLS MOM.  AND WHEN SHE FIRST CAME TO ME, YOUR HONOR, SHE

1    TOLD ME THAT THEY ASKED HER, SET ME UP.  AND I SAYS, OKAY, AND

2    I REALLY THOUGHT SHE WAS BEING ON THE LEVEL WITH ME BY TELLING

3    ME THAT INFORMATION.

4            THE COURT:  ALL RIGHT.

5            THE DEFENDANT:  AND SO BECAUSE OF THAT, I TRUSTED

6    HER.  AND I BROUGHT HER IN MY HOME, AND I SAID OKAY, I'LL HELP

7    YOU OUT, THINGS LIKE THAT.  I HAD HER WORKING AND SCHEDULING

8    APPOINTMENTS AND THINGS LIKE THAT, YOUR HONOR.  AND IT WENT

9    FROM -- UNFORTUNATELY, I DON'T MEAN -- THIS IS PROBABLY NOT

10   GOING TO SOUND NICE FROM ME, BREAKING HER HEART TO GIVE HER THE

11   INCENTIVE TO NINE MONTHS, TEN MONTHS LATER TO DECIDE, OKAY, NOW

12   HE PIMPED ME, HE FORCED ME TO DO THESE THINGS, HE BEAT THIS

13   PERSON, HE BEAT THAT PERSON.

14       AND I'VE LOST MY DAUGHTER.  AND I PROBABLY WILL NEVER SEE

15   HER AGAIN.  ANYBODY WHO KNOWS ME, AND THESE PEOPLE WHO KNOW ME,

16   THEY KNOW I LOVE MY DAUGHTER.  AND THIS WAS BASICALLY -- I'M

17   TELLING YOU, YOUR HONOR, NOT ONLY AM I SWEARING BEFORE GOD, I'M

18   SWEARING BEFORE EVERYBODY IN HERE.  THEY KNOW THAT THIS WAS

19   ABOUT MY CHILD.  THIS WAS ABOUT TAKING MY CHILD AWAY FROM ME.

20   AND IT GOT WAY OUT OF HAND AND STORIES HAVE GOTTEN REALLY

21   DISPROPORTIONATE ABOUT VIOLENCE AND THINGS LIKE THAT THAT

22   DIDN'T TAKE PLACE.  AND ONCE AGAIN, YOUR HONOR, IF I HAD HAD

23   THE OPPORTUNITY TO SUPPORT IT WITH EVIDENCE, I WOULD HAVE DONE

24   SO.

25            THE COURT:  ALL RIGHT.  WELL, MR. SMITH, I DON'T HAVE

1   THE ABILITY OR THE WISDOM TO KNOW WHAT IS THE TRUTH AND WHAT IS

2   NOT THE TRUTH.  WHAT I DO HAVE THE ABILITY TO DO IS TO ASSESS

3   THE EVIDENCE THAT WAS PRESENTED BEFORE ME AND TO TRY TO MAKE

4   FINDINGS IN ACCORDANCE WITH THE EVIDENCE THAT WAS PRESENTED TO

5   ME.

6       I HAVE TO TELL YOU, YOU'RE PROBABLY -- THE PRE-SENTENCE

7   REPORT DESCRIBED YOU AS FOLLOWS:  THAT YOU WERE POLITE; YOU

8   WERE CALM; YOU WERE ARTICULATE; YOU'RE AN INTELLIGENT

9   INDIVIDUAL; YOU EXHIBITED A DEGREE OF HUMILITY AND SENSE OF

10  HUMOR; AND YOU WERE CHARISMATIC.  IT'S NOT UNUSUAL FOR MEN WHO

11  ENGAGE IN THE ACT OF PROCURING WOMEN, MINORS, TO ENGAGE IN

12  PROSTITUTION TO BE EXACTLY THAT.  THIS IS NOT THE FIRST

13  TRAFFICKING OFFENSE THAT I'VE HEARD.

14      IT IS VERY COMMON FOR MEN, I SUPPOSE WOMEN -- I JUST HAD A

15  WOMAN APPEAR BEFORE ME AS A DEFENDANT.  BUT IT IS NOT UNUSUAL

16  TO HAVE MEN WHO ARE INTELLIGENT, GOOD SENSE OF HUMOR,

17  CHARISMATIC, ETC., TO -- IN FACT, THEY USE THOSE ASSETS TO

18  CONVINCE WOMEN AND YOUNG PEOPLE TO BECOME INVOLVED IN THIS

19  PROFESSION, IF YOU WILL, BEING THE OLDEST PROFESSION.

20      NOW I REMEMBER -- BY THE WAY, I WAS GIVEN A CD, WITH -- I

21  THINK IT WAS SUPPOSED TO BE THREE OR FOUR CONVERSATIONS WITH

22  THE MINOR.  UNFORTUNATELY, I WAS ONLY ABLE TO HEAR ONE BECAUSE

23  THE CD WOULDN'T PLAY THE OTHER THREE.

24      BUT THE ONE I HEARD, FRANKLY, CONVINCED ME OF JUST HOW

25  CHARISMATIC YOU ARE.  I COULD TELL FROM LISTENING TO THAT CD

1   HOW YOU WERE TELLING THE MINOR IN THIS CASE, HOW, GOSH, IF SHE

2   TOLD THE TRUTH, YOU KNOW, YOU AND THE BABY AND SHE COULD HAVE

3   THIS GREAT LIFE.  AND THAT IS TYPICAL.  THAT IS, AS MS. HIGGINS

4   TESTIFIED, THAT IS WHAT YOU DO.

5       THE FACT THAT YOU MAY HAVE A COMPLETELY DIFFERENT LIFE

6   WITH YOUR OWN FAMILY, AND WITH YOUR OWN DAUGHTERS, DOES NOT

7   MEAN THAT YOU CANNOT HAVE A COMPLETELY DIFFERENT LIFE WITH

8   REGARDS TO OTHERS, AND OTHER MINORS.

9       SO WHAT I HEARD IN THAT RECORDED CONVERSATION IS

10  COMPLETELY CONSISTENT WITH, A, THE WAY PROBATION DESCRIBES YOU,

11  WITH THE WAY MS. HIGGINS AND THE MINOR DESCRIBES YOU, AND THE

12  WAY THAT I THINK IS A VERY COMMON WAY FOR MEN WHO PROSTITUTE

13  WOMEN TO TELL THEM THEY LOVE THEM, THEY WANT TO HAVE A GOOD

14  LIFE WITH THEM, AND THEIR BABIES, WHAT HAVE YOU.  BUT IN

15  RETURN, WHAT THEY GET IS A LIFE OF MISERY.

16      PROBATION GOES ON TO SAY, HOWEVER, THE UNDERSIGNED,

17  PUTTING ALL AVAILABLE FACTS INTO THE OVERALL EQUATION, IT

18  APPEARS THAT MR. SMITH IS ANYTHING BUT A PEACEFUL, CHARITABLE,

19  OUTSTANDING CITIZEN.  AND THAT IS REFLECTED BY YOUR CRIMINAL

20  RECORD AND BY OTHER CONTACTS THAT YOU'VE HAD WITH LAW

21  ENFORCEMENT.

22      WHEN I WENT THROUGH THIS -- I MEAN, I'M NOT IMPOSING THE

23  SENTENCE I AM GOING TO IMPOSE LIGHTLY.  I WENT THROUGH THIS

24  PRE-SENTENCE REPORT.  I WENT BACK AND REFRESHED MY RECOLLECTION

25  ABOUT TESTIMONY AND SO ON AND SO FORTH.  AND I HAVE SO MANY

1    NOTES, IF I WERE HERE FOR TWO HOURS, I PROBABLY WOULDN'T BE

2    ABLE TO GET THROUGH THEM ALL.

3        BUT I RECALL TESTIMONY FROM THE VICTIM, FIRST OF ALL, THAT

4    SHE TOLD YOU SHE WAS A MINOR.  I HAVE NO ILLUSIONS ABOUT THE

5    FACT THAT THE MINOR IN THIS CASE WAS AN INNOCENT CHILD, IN THE

6    SENSE THAT SHE HADN'T HAD A WORLDLY LIFE.  AS I RECALL, SHE WAS

7    LIVING IN A TENT, IF I'M NOT MISTAKEN, IN A JUNKYARD, IF I

8    RECALL CORRECTLY.  I RECALL HER TALKING ABOUT WANTING TO BE IN

9    A SCAM OR -- I CAN'T RECALL THE PRECISE WORD SHE USED, IN THE

10   GAME OR SOMETHING ALONG THOSE LINES.  SHE TESTIFIED THAT THAT

11   DID NOT INCLUDE PROSTITUTION IN IT.  I GATHERED IT WAS

12   SOMETHING DIFFERENT FROM LISTENING TO HER TESTIFY.

13       SO I HAVE NO ILLUSIONS ABOUT THIS BEING SOME GRADE SCHOOL

14   GIRL, WHO WAS ENTICED INTO THIS.  BUT I DO REMEMBER, I DO

15   REMEMBER HER TESTIMONY QUITE CLEARLY ABOUT THE FACT THAT, YOU

16   KNOW, YOU BASICALLY BROUGHT HER IN, AND I REMEMBER HER

17   TESTIFYING ABOUT THE ONE WOMAN WHO WAS KNOCKED OUT.

18       AND YOU STRIKE ME AS A GUY WHO COULD PROBABLY KNOCK OUT A

19   WOMAN WITH ONE PUNCH.  AND SHE TESTIFIED THAT YOU KNOCKED THE

20   WOMAN OUT.  AND I ALSO REMEMBER HER TESTIFYING THAT WHEN SHE

21   TRIED TO GET OUT, YOU GRABBED HER AND THREW HER INTO THE CAR.

22   THAT DOES NOT STRIKE ME AS THE KIND OF MAN THAT, ON THE

23   SURFACE -- YOU'RE BIG.  AND THEN I LOOK AT YOUR CRIMINAL

24   HISTORY.  AND YOU KNOW, MR. SMITH, IN 1991, YOU WERE CONVICTED

25   OF ASSAULT WITH A FIREARM, USING A DEADLY WEAPON.

1            THE DEFENDANT:  SIR --

2            THE COURT:  YOU'VE SAID WHAT YOU'RE GOING TO SAY.  IT

3    IS MY TURN.  IN 1992, YOU WERE CONVICTED OF ASSAULT.  IN 1996,

4    YOU WERE CONVICTED OF CONSPIRACY TO COMMIT CHILD ABDUCTION.

5            NOW I KEPT OUT ALL OF THE SURROUNDING CIRCUMSTANCES OF

6    THAT ABDUCTION BECAUSE I THOUGHT IT WOULD BE TOO PREJUDICIAL

7    AND THAT THE JURY MIGHT BE INFLAMED.  BUT WHEN I LOOK AT THE

8    PRE-SENTENCE REPORT, AND, OF COURSE, WHEN I LOOK AT THE OTHER

9    COUNTS THAT WERE FILED, WHICH I KNOW WERE DISMISSED AS PART OF

10   THE PLEA BARGAIN, BUT THAT CHILD WAS BEING ABDUCTED FOR

11   PURPOSES OF COMMITTING PIMPING.  THAT IS NOT AN INNOCENT

12   VIOLATION.

13           NOW IN YOUR PRE-SENTENCE REPORT INTERVIEW, I BELIEVE YOU

14   SAID THAT YOU PLED TO THAT BECAUSE YOU DIDN'T WANT YOUR

15   BROTHER, WHO WAS A THREE-STRIKER, TO GO TO PRISON.  WELL, I

16   DON'T KNOW -- I DON'T KNOW HOW MUCH CREDIBILITY I CAN GIVE TO

17   THAT.  BUT IF THAT WAS YOUR REASON FOR PLEADING GUILTY, THEN

18   THAT'S TOO BAD.  BECAUSE, PERHAPS, YOUR BROTHER DID BELONG IN

19   PRISON FOR 25 YEARS TO LIVE AS A THREE-STRIKER, AND YOU KEPT

20   THAT FROM HAPPENING.  I DON'T KNOW.  THEN IN 1994, YOU HAVE A

21   CONVICTION FOR INTIMIDATING AND DISPLAYING A WEAPON.  I LOOK AT

22   ALL THE OTHER LAW ENFORCEMENT CONTACTS.

23           MR. SMITH, I DON'T KNOW HOW YOU CAN TELL ME THAT YOU'RE

24   NOT A VIOLENT MAN.  YOU MAY NOT BE VIOLENT WITH YOUR OWN

25   CHILDREN.

1      AND IN MARCH 31, 1994, YOU WERE ARRESTED IN SPOKANE FOR

2   GOING TO A VICTIM'S HOME, FORCING YOUR WAY INTO THE HOME,

3   THREATENING TO KILL THE VICTIM AND THE GIRLFRIEND, CLAIMING

4   THAT THE VICTIM, WHO HAD PREVIOUSLY WORKED FOR YOU AS AN

5   ESCORT, WHICH, OF COURSE, IS CODE FOR WHAT WE ALL KNOW PROBABLY

6   WAS REALLY GOING ON, OWED YOU MONEY.

7      IN 1994, PAMELA HOLMES, WHO WAS COOPERATING WITH SOME

8   METHAMPHETAMINE BUST, APPARENTLY, WHEN THE OFFICERS EXECUTED A

9   SEARCH WARRANT ON YOUR PLACE, THEY LOCATED AND SEIZED AN

10   UNSPECIFIED QUANTITY OF METHAMPHETAMINE, SCALES, $1,300, AND

11   THREE FIREARMS.

12      ONE OF THE INDIVIDUALS WAS QUESTIONED, AND HE SAID THAT HE

13   WORKED AS A CHAUFFEUR, THAT HE OPERATED AN ESCORT SERVICE, AND

14   HE DROVE THE GIRLS, QUOTE/UNQUOTE, TO DIFFERENT LOCATIONS.

15      IN JANUARY 1995, YOU WERE ARRESTED IN SPOKANE FOR ASSAULT,

16   DOMESTIC VIOLENCE, SHOWING THAT YOU ASSAULTED YOUR GIRLFRIEND,

17   PAMELA HOLMES, WHO WAS REFERRED TO PREVIOUSLY.

18      1995, YOU WERE ARRESTED FOR PIMPING.

19      1996, YOU WERE ARRESTED FOR ASSAULT WITH A DEADLY WEAPON

20   AND BATTERY, WITH SERIOUS BODILY INJURY.  THE VICTIM IN THAT

21   CASE WAS MS. SMITH, WHO TESTIFIED THAT YOU ENTERED -- I'M

22   SORRY, THE VICTIM TESTIFIED THAT YOU HAD ENTERED THE HOME

23   THROUGH THE KITCHEN WINDOW AND ASSAULTED THE VICTIM WITH A

24   BASEBALL BAT.  AGAIN, MS. HOLMES WAS INVOLVED IN THAT OFFENSE.

25      IN 1996, YOU WERE ASKED TO LEAVE THE HOUSE BY MS. HOLMES.

1   YOU REFUSED TO LEAVE, BEGAN TO PUSH AND HIT MS. HOLMES.   WHEN

2   SHE TRIED TO CONTACT THE POLICE OFFICER, YOU PULLED THE

3   TELEPHONE CORD FROM THE RECEIVER, AND THEN YOU USED SOME NOT SO

4   NICE WORDS TOWARD HER.

5       IN MAY 1996, MS. HOLMES SAID YOU DESTROYED SEVERAL ITEMS

6   OF HER CLOTHING, TOLD HER YOU WERE GOING TO KILL HER, AND ADDED

7   THAT IF YOU WERE TAKEN INTO CUSTODY, YOUR FRIENDS FROM THE

8   LITTLE AFRICA GANG WOULD KILL HER ON YOUR BEHALF.

9       MS. HOPE STATED THAT SHE HAD BEEN A VICTIM OF BETWEEN 40

10  AND 50 DOMESTIC VIOLENCE INCIDENTS.   I CAN GO ON AND I CAN GO

11  ON.

12      I RECALL WATCHING THE VIDEO OF WHEN YOU WERE UPSET AT THE

13  MINOR IN THIS CASE, SHE WAS ANSWERING THE WRONG PHONES.   I

14  HEARD THE MINOR TESTIFY.   I WATCHED HER TESTIFY.   I SAW THE

15  TEARS IN HER EYES.   AGAIN, I KNOW SHE'S NOT LED AN INNOCENT

16  LIFE, BUT TO ME, SHE SEEMED PRETTY CREDIBLE.   I DON'T HAVE A

17  LIE DETECTOR THAT I CAN USE TO DECIDE WHETHER OR NOT SHE WAS

18  LYING, BUT TO ME, SHE CERTAINLY SEEMED TO BE TRUTHFUL AND

19  HONEST IN HER TESTIMONY.

20      I'VE CONSIDERED ALL OF THE FACTORS, ALL THE 3553(A)

21  FACTORS.   YOUR PAST FOLLOWS YOU, MR. SMITH.   AND,

22  UNFORTUNATELY, YOUR PATH LEADS ME TO A CONCLUSION THAT THERE IS

23  ABSOLUTELY NO REASON FOR ME TO DEVIATE FROM THE GUIDELINES

24  THAT, I BELIEVE, ARE APPROPRIATE IN THIS CASE.   THERE IS NO

25  QUESTION THAT THIS IS A BASE OFFENSE LEVEL OF 24 -- I'M SORRY,

1    34.

2         SIR, THERE IS NO QUESTION YOU USED A COMPUTER.  I REMEMBER

3    WATCHING THE VIDEO WHEN YOU WERE USING THE COMPUTER.  THERE IS

4    NO QUESTION THAT THIS WAS A COMMERCIAL SEX ACT.  THERE IS NO

5    QUESTION THAT YOU USED UNDUE INFLUENCE.  I HEARD THE VICTIM

6    TESTIFY.  AND THERE IS NO QUESTION ABOUT YOUR ROLE IN THIS

7    OFFENSE.  IT IS PRETTY OBVIOUS THAT, SIR, YOU HAVE BEEN

8    INVOLVED IN THIS ACTIVITY FOR A LONG, LONG, LONG TIME.

9         ALL OF THAT LEADS ME TO CONCLUDE -- I'M NOT GOING TO FIND

10   AN INCREASE FOR OBSTRUCTION OF JUSTICE, ALTHOUGH, I THINK IT

11   PROBABLY IS WARRANTED, BECAUSE I DON'T KNOW THAT YOU HAVE TO

12   USE FORCE OR THREATS IN ORDER TO OBSTRUCT JUSTICE.  I THINK YOU

13   CAN ACCOMPLISH THE VERY SAME THING WHEN YOU HAVE SOMEONE WHO IS

14   VULNERABLE, AND YOU TELL THEM, TELL THE TRUTH.

15        BY THE WAY, I NOTED ONE THING, NO WHERE, AT ANY TIME, AT

16   LEAST IN THE PHONE CALL THAT I HEARD, DID YOU EVER DENY THAT

17   YOU WERE USING HER FOR PROSTITUTION PURPOSES.  I NEVER HEARD

18   YOU SAY ANYTHING LIKE, YOU KNOW, YOU NEVER TOLD ME YOU WERE A

19   MINOR, AS SHE TESTIFIED AT TRIAL.  AND IT'S PRETTY -- PRETTY

20   CLEAR FROM WHAT I HEARD FROM MS. HIGGINS AND FROM THE MINOR

21   THAT THE WAY YOU WORK IS, YOU TELL THEM YOU LOVE THEM, YOU GET

22   THEM TO BECOME ATTACHED TO YOU, AND THEN YOU USE THEM.

23        I THINK CLEARLY AN OBSTRUCTION OF JUSTICE ENHANCEMENT

24   WOULD APPLY.  BUT IN THIS CASE, IT IS NOT GOING TO GET US

25   ANYWHERE BECAUSE THE BOTTOM LINE IS THAT EVEN IF I DON'T USE

```
1   THE TWO-LEVEL INCREASE FOR OBSTRUCTION OF JUSTICE, THAT GETS US
2   TO AN ADJUSTED OFFENSE LEVEL OF 42, WITH A CRIMINAL HISTORY
3   SCORE OF 3, CRIMINAL HISTORY CATEGORY 2.  I BELIEVE, IF I'M NOT
4   MISTAKEN, THAT RESULTS IN A 360 TO LIFE.  I'M NOT GOING TO
5   IMPOSE LIFE.  I DON'T THINK THAT WOULD BE REASONABLE OR
6   PROPORTIONAL.  BUT I DO THINK THAT THE LOW END OF THE GUIDELINE
7   RANGE IS APPROPRIATE.  IN ORDER TO MAKE SURE, TO THE EXTENT
8   THAT I CAN, THAT WHEN YOU GET OUT OF PRISON -- I KNOW YOUR AGE,
9   YOU'RE 41 YEARS OLD.  WHEN YOU GET OUT OF PRISON, I SUPPOSE YOU
10  COULD STILL BE ENGAGED IN THIS TYPE OF BEHAVIOR.  BUT MAYBE
11  YOU'LL CHANGE YOUR WAYS BETWEEN NOW AND THEN.  I DON'T KNOW.
12      SO AFTER CONSIDERING ALL THE 3553(A) FACTORS,
13  NOTWITHSTANDING MR. LANAHAN'S VALIANT EFFORTS ON YOUR BEHALF, I
14  BELIEVE THAT 360 MONTHS IS REASONABLE AND SUFFICIENT BUT NOT
15  GREATER THAN NECESSARY.  SO I'M GOING TO REMAND YOU TO THE
16  BUREAU OF PRISONS FOR A PERIOD OF 360 MONTHS.  HOPEFULLY THAT
17  WILL ACT AS A DETERRENT TO YOU AND, PERHAPS, TO OTHERS TO USE
18  MINORS AS IF THEY WERE OBJECTS, RATHER THAN PEOPLE.
19          THE CLERK:  THAT'S TO BOTH COUNTS, JUDGE?
20          THE COURT:  I'M SORRY?
21          THE CLERK:  BOTH COUNTS?
22          THE COURT:  NO.  ONE COUNT IS 120 MONTHS.  I'LL GET
23  TO IT, JUST A MINUTE, BUT THEY'LL RUN CONCURRENT.
24          MR. LANAHAN:  YOUR HONOR, CAN I SAY ONE -- I KNOW THE
25  COURT HAS IMPOSED SENTENCE.  OBVIOUSLY, I'M NOT SPEAKING AT
```

1   THIS -- BUT I -- THERE WERE SOME OF THE FINDINGS THAT I THINK

2   THE COURT WAS USING, I DON'T KNOW IF YOU WERE USING THAT AS

3   3553(A) FACTORS, OR GUIDELINE FACTORS, WHICH WE DID DISPUTE IN

4   THE PRE-SENTENCE REPORT.  SO WHERE THERE WASN'T A CASE WHERE WE

5   ACTUALLY HAD A HEARING, WHERE IT'S NOW -- IT IS SAID IN THE

6   PRE-SENTENCE REPORT, AND WE'RE DENYING IT, IF YOU ACTUALLY

7   CONSIDER THOSE FACTORS, I THINK THEN WE HAVE TO HAVE A HEARING

8   IF THOSE ARE GOING TO BE USED.  I'M MAKING THE OBJECTION UNDER

9   RULE 32.  THAT IF THE COURT ISN'T CONSIDERING IT, THAT IS FINE.

10  BUT SINCE IF WE ARE DEALING WITH FACTORS IN WHICH WE DON'T HAVE

11  TESTIMONY, WE HAVEN'T HAD A HEARING, AND YOU HAVE A

12  PRE-SENTENCE REPORT SAYING ONE THING AND WE'RE SAYING SOMETHING

13  ELSE, THEN WE NEED HAVE A HEARING ON THAT.  SO --

14          MS. SERANO:  YOUR HONOR, WE DON'T NEED TO HAVE A

15  HEARING.  WE HAD A TRIAL.  AND AT THE TRIAL, THE EVIDENCE CAME

16  OUT THAT THERE WAS A COMPUTER USED.  YOUR HONOR SAW IT ON THE

17  VIDEOTAPE.  WE ALSO HAD A FORENSIC EXPERT TALK ABOUT THE

18  CRAIG'S LIST ADS THAT WERE FOUND ON THE DEFENDANT'S COMPUTER.

19  WE HAD THE TRIAL TESTIMONY OF THE VICTIM TALKING ABOUT THE

20  COMMERCIAL SEX ACT, CORROBORATED BY THE POSTINGS FROM CRAIG'S

21  LIST, MADE FROM THE DEFENDANT'S COMPUTER.

22      AND WITH REGARD TO UNDUE INFLUENCE, AGAIN, YOUR HONOR

23  HEARD THE TRIAL TESTIMONY.  YOUR HONOR NOTED THE AGE BETWEEN --

24  THE DIFFERENCE BETWEEN THE VICTIM AND THIS DEFENDANT AND THE

25  ACTIONS THAT THE DEFENDANT TOOK.  AND WITH REGARD TO ROLE,

1    OBVIOUSLY THAT IS YOUR HONOR'S DISCRETION.  BUT THERE IS NO

2    HEARING NEEDED; WE HAD A TRIAL.

3            MR. LANAHAN:  THAT'S NOT THE POINT OF MY OBJECTION.

4    MY POINT OF THE OBJECTION IS, WHEN YOU ARE GOING THROUGH HIS

5    CRIMINAL HISTORY, TALKING ABOUT PRIOR OFFENSES OR PRIOR

6    ARRESTS, AND IF YOU WERE MAKING FACTUAL FINDINGS FROM THOSE

7    WHICH WE HAVE DISPUTED --

8            THE COURT:  NO.  WHAT I WAS USING THOSE -- ONE OF THE

9    THINGS I HAVE TO LOOK AT IS THE SERIOUSNESS OF THE OFFENSE, THE

10   NATURE, HISTORY, CHARACTERISTICS OF THE DEFENDANT.

11           MR. LANAHAN:  RIGHT.

12           THE COURT:  WHICH I'VE DONE.

13           MR. LANAHAN:  AND AS TO 3553(A) FACTORS.  AND SO ALL

14   I'M SAYING IS, THAT IF THE COURT IS USING THOSE AS 3553(A)

15   FACTORS THAT WOULD INFLUENCE THE SENTENCE, AND WE ARE -- AND

16   THOSE WERE DISPUTED IN THE PRE-SENTENCE, AND OUR OBJECTIONS, WE

17   WOULD NEED TO HAVE A HEARING ON IT.  IF YOU HAVE NOT CONSIDERED

18   THEM IN DETERMINING THE GUIDELINE RANGE, THEN OBVIOUSLY --

19           THE COURT:  I'VE CONSIDERED THEM WITH REGARD TO

20   3553(A) FACTORS.  AND NO, I DON'T THINK WE HAVE TO HAVE A

21   HEARING ON THAT.

22           MR. LANAHAN:  ALL RIGHT.

23           THE COURT:  ALL RIGHT.  SO I THINK MS. SERANO IS

24   CORRECT.  I HEARD THE TRIAL.  I THINK ALL OF THE ENHANCEMENTS

25   ARE UNDER A BASE OFFENSE LEVEL OF 34.  I KNOW THAT ALL OF THE

1    OTHER INCREASES WERE SUPPORTED BY THE EVIDENCE.  AND SO I THINK

2    THAT, AS I SAID, I'M GOING TO REMAND HIM TO THE CUSTODY OF

3    BUREAU OF PRISONS FOR A PERIOD OF 360 MONTHS ON COUNT 1, 120

4    MONTHS ON COUNT 2.  THOSE TWO SENTENCES SHALL RUN CONCURRENT.

5         WITH REGARDS TO SUPERVISED RELEASE, I'LL PLACE HIM ON

6    SUPERVISED RELEASE ON COUNT 1 FOR A PERIOD OF FIVE YEARS; THREE

7    YEARS ON COUNT 2.  THEY WILL RUN CONCURRENT.  I'LL ORDER THAT

8    HE COMPLY WITH ALL STANDARD AND MANDATORY CONDITIONS OF

9    SUPERVISED RELEASE, INCLUDING THE FOLLOWING SPECIAL CONDITIONS:

10   HE'LL PROVIDE COMPLETE DISCLOSURE OF PERSONAL, AND BUSINESS,

11   FINANCIAL RECORDS TO THE PROBATION OFFICER, AS REQUESTED; HE'LL

12   REPORT ALL VEHICLES OWNED OR OPERATED OR IN WHICH HE HAS AN

13   INTEREST TO THE PROBATION OFFICER; HE'LL RESOLVE ALL

14   OUTSTANDING WARRANTS WITHIN 60 DAYS, AND SUBMIT HIS PERSON, HIS

15   PROPERTY, HIS HOUSE, HIS RESIDENCE, HIS VEHICLE, HIS PAPERS,

16   HIS COMPUTERS, ELECTRONIC COMMUNICATIONS OR OTHER DATA STORAGE

17   DEVICES OR MEDIA AND EFFECTS TO SEARCH AT ANY TIME, WITH OR

18   WITHOUT A WARRANT, BY ANY LAW ENFORCEMENT OR PROBATION OFFICER,

19   WITH REASONABLE SUSPICION CONCERNING A VIOLATION OF PROBATION,

20   UNDER SUPERVISED RELEASE, OR UNLAWFUL CONDUCT, AND OTHERWISE AN

21   UNLAWFUL DISCHARGE OF THE OFFICER'S DUTIES.

22        HE WILL NOT ASSOCIATE WITH OR HAVE ANY CONTACT WITH ANY

23   SEX OFFENDERS UNLESS IN AN APPROVED TREATMENT AND/OR COUNSELING

24   SETTING, HE SHALL CONSENT TO THE INSTALLATION OF SYSTEMS THAT

25   WILL ENABLE THE PROBATION OFFICER TO MONITOR COMPUTER USE ON

1    ANY COMPUTER OWNED OR CONTROLLED BY THE OFFENDER, AND HE SHALL

2    PAY FOR THE COSTS OF INSTALLATION OF THE COMPUTER SOFTWARE; HE

3    WILL NOT HAVE ANY CONTACT, DIRECT OR INDIRECT, EITHER

4    TELEPHONICALLY, VISUALLY, VERBALLY, OR THROUGH WRITTEN

5    MATERIAL, OR THROUGH ANY THIRD-PARTY COMMUNICATION WITH THE

6    VICTIM OR VICTIM'S FAMILY WITHOUT PRIOR APPROVAL OF THE

7    PROBATION OFFICER.

8        HE'LL NOT HAVE UNSUPERVISED CONTACT WITH ANY CHILD UNDER

9    THE AGE OF 18, UNLESS IN THE PRESENCE OF A SUPERVISING ADULT

10   WHO IS AWARE OF THE DEFENDANT'S DEVIANT SEXUAL BEHAVIOR AND

11   CONVICTION, AND WITH THE PRIOR APPROVAL OF THE PROBATION

12   OFFICER.

13       HE'LL COMPLETE A SEX OFFENDER EVALUATION, WHICH MAY

14   INCLUDE PERIODIC PSYCHOLOGICAL, PHYSIOLOGICAL TESTING AND

15   COMPLETION OF THE ABLE ASSESSMENT, AT THE DIRECTION OF THE

16   COURT OR THE PROBATION OFFICER; AND THAT THE OFFENDER

17   PARTICIPATE AND SUCCESSFULLY COMPLETE AN APPROVED

18   STATE-CERTIFIED SEX OFFENDER TREATMENT PROGRAM, INCLUDING

19   COMPLIANCE OF TREATMENT IN REGARD OF THE PROGRAM --

20       MA'AM, LET ME SAY THIS, I HAVE A QUESTION ABOUT THAT.  IN

21   THIS CASE, THE EVIDENCE WAS -- WELL, I GUESS HE DID HAVE SEX

22   WITH A MINOR, SO I GUESS THAT WOULD APPLY.  NEVER MIND.

23       THE OFFENDER WILL ALLOW RECIPROCAL RELEASE OF INFORMATION

24   TO THE PROBATION OFFICER AND THE TREATMENT PROVIDER; AND THE

25   OFFENDER MAY ALSO BE REQUIRED TO CONTRIBUTE TO THE COSTS OF

1    SERVICES RENDERED, IN AN AMOUNT TO BE DETERMINED BY THE

2    PROBATION OFFICER, BASED ON HIS ABILITY TO PAY.

3        HE'LL RESIDE IN A RESIDENCE APPROVED IN ADVANCE BY THE

4    PROBATION OFFICER, AND ANY CHANGES IN RESIDENCE SHALL BE

5    PRE-APPROVED BY THE PROBATION OFFICER; HE'LL HAVE NO

6    AFFILIATION OR CONTACT WITH OR POSSESSION OF ANY RELATED

7    PARAPHERNALIA OR ANY STREET GANGS, INCLUDING BUT NOT LIMITED TO

8    THE LITTLE AFRICA GANG.

9        NOW THE FINE IS IN THE RANGE OF 25,000 TO $250,000.  NOW

10   PROBATION IS RECOMMENDING THAT HE PAY A $10,000 FINE.  I

11   BELIEVE HE'S AN ABLE-BODIED MAN, WHO CAN WORK WHILE HE'S IN

12   PRISON.  I DON'T KNOW IF HE COULD PAY $10,000 WHILE HE'S IN

13   PRISON.  I DON'T THINK THAT WOULD BE POSSIBLE.  LET ME SEE.

14        MS. SERANO:  WE WOULD ASK THAT ANY IMPOSITION OF A

15   FINE BE WAIVED AND PUT TOWARDS RESTITUTION, YOUR HONOR.

16        THE COURT:  OKAY.  NOW, THE PSR DOESN'T ADDRESS

17   RESTITUTION.  I'M TRYING TO REMEMBER, IF -- WHAT I SAW IN

18   CONNECTION WITH RESTITUTION IN THIS CASE.

19        MS. SERANO:  I PUT IT IN THE GOVERNMENT'S SENTENCING

20   MEMORANDUM.

21        THE COURT:  OKAY.  MR. LANAHAN, DID YOU ADDRESS

22   RESTITUTION IN YOUR RESPONSE?

23        MR. LANAHAN:  NO, I DIDN'T, YOUR HONOR.  BUT I -- I

24   MEAN, I -- WELL, FIRST OF ALL, I KNOW IT IS NOT A BASIS ON

25   WHICH TO OBJECT TO RESTITUTION, IF SOMEONE CAN'T MAKE IT.  BUT

1   REALISTICALLY, IF THE COURT IS CONCERNED, OBVIOUSLY, I THINK

2   THE GOVERNMENT IS ASKING FOR A SUM OF $100,000 OF RESTITUTION.

3   REALISTICALLY, HE CAN'T MAKE IT.

4        BUT ALSO, IN ADDITION, I THINK IT KINDS OF TURNS

5   RESTITUTION ON ITS HEAD TO SAY THAT SOMEHOW OR ANOTHER SOMEONE

6   WHO IS ENGAGING IN ILLEGAL ACTIVITY SHOULD SOMEHOW BE GIVEN

7   RESTITUTION FOR COMMITTING ILLEGAL ACTIVITY, REGARDLESS OF

8   WHATEVER --

9             THE COURT:  SAY THAT AGAIN, MR. LANAHAN.

10            MR. LANAHAN:  WELL, THE GOVERNMENT HAS -- THE

11   GOVERNMENT'S THEORY, AS I SEE HOW THEY ARE CALCULATING

12   RESTITUTION, IS BASED ON WHAT THEY CALCULATED WOULD BE THE

13   PROFITS THAT THE MINOR COULD HAVE MADE FROM THIS ILLEGAL

14   ACTIVITY.  AND THAT THEY COME UP WITH THIS FORMULA BY WHICH SHE

15   IS TO BE COMPENSATED FOR -- SHE SHOULD HAVE GOTTEN THE FULL

16   PROCEEDS FROM THE ILLEGAL ACTIVITY.

17            THE COURT:  YOU KNOW, I RESEARCHED THIS ONCE BEFORE

18   BECAUSE I HAD A TRIAL, A TRAFFICKING CASE ONCE BEFORE, AND MY

19   RECOLLECTION IS, THAT THAT IS HOW YOU DO IT.  THAT'S HOW THE

20   CASES SAY YOU DO IT.

21            MR. LANAHAN:  IT DOES SEEM TO ME BIZARRE.  IT IS

22   ALMOST LIKE SAYING, YOU'RE STEALING PROPERTY THAT ISN'T YOURS.

23   THERE IS SORT OF A -- YOU'RE BEING COMPENSATED -- THERE REALLY

24   IS SORT OF -- I DON'T KNOW HOW TO SAY IT, UNJUST ENRICHMENT.

25            THE COURT:  THAT IS EXACTLY WHAT IT IS, AS A MATTER

1    OF FACT.  I BELIEVE THE CASES TALK ABOUT THAT.  IT IS UNJUST

2    ENRICHMENT TO THE DEFENDANT TO PROSTITUTE SOMEONE OUT, PUT THEM

3    OUT ONTO THE STREET, AND THEN GET MONEY FROM THEM AND KEEP IT.

4    AND SO I SUPPOSE -- I UNDERSTAND WHAT YOU'RE SAYING.

5              MR. LANAHAN:  YOU KNOW WHAT I'M SAYING.

6              THE COURT:  SURE.

7              MR. LANAHAN:  BUT IT IS ILLEGAL ACTIVITY FOR

8    EVERYBODY.

9              THE COURT:  IT SEEMS ODD.  BUT, OF COURSE, WHEN

10   YOU'RE TALKING ABOUT A MINOR --

11             MR. LANAHAN:  WELL --

12             THE COURT:  -- RIGHT?

13             MR. LANAHAN:  THERE ARE MANY ODDITIES OF THE LAW, AND

14   I UNDERSTAND.  BUT IT DOES SEEM -- AND SOMETIMES ONE GETS

15   THERE.  BUT IT -- SO THAT IS MY CONCERN.

16             THE COURT:  OKAY.

17             MR. LANAHAN:  IT ALSO SEEMS TO BE THE RATE -- I KNOW

18   IT IS A LONG HEARING, AND RESTITUTION --

19             THE COURT:  THAT'S OKAY.  IT IS A VERY SERIOUS

20   MATTER.

21             MR. LANAHAN:  BUT, OBVIOUSLY, THE RATE -- I MEAN, I'M

22   NOT SURE WE REALLY HAVE AN HOURLY RATE; HOW LONG WOULD WE DO

23   IT?  YOU KNOW, HOW SHE WOULD BE PAID, HOW OFTEN, WHATEVER THE

24   HOURS WERE GOING TO BE, HOW WE'RE GOING TO GET TO THAT FORMULA.

25             SO I WOULD BE ASKING THE COURT TO DO THIS IN A

1    COMMON-SENSE APPROACH, ALSO LOOK AT THIS AND SAY, WHEN HE GETS

2    OUT IN 25 YEARS, WHAT IS GOING TO BE THE ABILITY OF HIM MAKING

3    THE RESTITUTION?

4            THE COURT:  WELL, I THINK, THE PLAN WOULD BE, HE

5    SEEMS TO BE ABLE-BODIED, AND HE CERTAINLY CAN WORK WHILE HE'S

6    IN PRISON.  AND HE CAN AT LEAST PAY OFF PART OF THAT

7    RESTITUTION, WHICH IS WHY MS. SERANO IS SAYING, DON'T IMPOSE A

8    FINE, INSTEAD LET IT GO TO RESTITUTION.

9            MR. LANAHAN:  WELL, $10,000, IF IT'S A $10,000

10   RESTITUTION, OKAY, THAT SEEMS TO BE -- I'M NOT GOING TO GO ANY

11   FURTHER.

12           THE COURT:  NO --

13           MR. LANAHAN:  IF THAT IS WHERE THE COURT WAS AIMING.

14           THE COURT:  NO.  DON'T PUT WORDS IN MY MOUTH.  THAT'S

15   NOT WHAT I WAS SAYING.

16           MR. LANAHAN:  OKAY, WELL, I DON'T KNOW --

17           THE COURT:  LET ME ASK MS. SERANO.

18       MS. SERANO, I THOUGHT THERE WAS A RECENT CASE -- WHEN I

19   SAY "RECENT," I'M TALKING ABOUT PROBABLY LAST YEAR, SIX MONTHS

20   OR SO, WHEREIN, THE NINTH CIRCUIT STRUCK DOWN AN ORDER OF

21   RESTITUTION IN A CASE --

22           MS. SERANO:  IT WAS A CHILD PORN CASE.

23           THE COURT:  IT WAS A CHILD PORN CASE.

24           MS. SERANO:  IT WAS U.S. VS. KENNEDY.  AND IT TALKED

25   ABOUT MANDATORY RESTITUTION WHERE THERE WAS NO PROXIMATE CAUSE

1   TO THE DEFENDANT WHO POSSESSED THE IMAGES OF THE CHILDREN AND

2   WHAT DAMAGE THAT MAY HAVE DONE TO THE CHILDREN WHOSE IMAGES

3   WERE DEPICTED.  IT WAS A PROXIMATE CAUSE ISSUE, UNDER 2259.

4   AND I DON'T THINK THERE IS AN ARGUMENT HERE; ALTHOUGH, I'M SURE

5   MR. LANAHAN WILL TRY.

6          THE COURT:  ALL RIGHT.  SO THAT WAS -- THAT WAS A

7   CHILD PORN CASE.  YOU'RE RIGHT.  THANK YOU.

8      I KNEW IF I ASKED HER THE QUESTION, SHE'D KNOW THE ANSWER

9   JUST LIKE THAT.

10     THANK YOU.  WELL, DIRECT ME TO THE PORTION OF --

11         MS. SERANO:  WE'RE ASKING UNDER THE UNJUST ENRICHMENT

12  ANALYSIS, THAT BASED ON THE TRIAL TESTIMONY, WHAT THE VICTIM

13  TESTIFIED, THAT SHE WORKED SEVEN DAYS A WEEK, HER QUOTA WAS

14  ANYWHERE FROM 1,000 TO $1,200 A DAY, SO SHE WORKED FROM

15  APPROXIMATELY JANUARY TO JULY 2010, SIX MONTHS, APPROXIMATELY

16  180 DAYS, BASED ON THE LOW END OF THE $1,000 A DAY, WE'RE

17  ASKING FOR AN AMOUNT OF $180,000; PLUS THE AMOUNT THAT SHE HAS

18  PROVIDED FOR MEDICAL EXPENSES, MOVING EXPENSES.  SHE HAS

19  RELOCATED OUT OF THE AREA DUE TO THIS CASE AND THIS DEFENDANT;

20  $600 FOR EDUCATION, FOR AN ADDITIONAL $2,900.

21     IF YOUR HONOR USES THE FAIR LABOR STANDARDS ANALYSIS,

22  BASED ON WHAT SHE WAS MAKING, IT WOULD YIELD ONLY $7,500, $300

23  A WEEK, TIMES 25 WEEKS.  CERTAINLY THE DEFENDANT --

24         THE COURT:  ARE YOU SERIOUS?  THERE IS NO WAY I'M

25  GOING TO IMPOSE -- SO SOMEBODY MOWING LAWNS, I WOULD GIVE THEM

1    RESTITUTION, PAY THEM THE SAME AS THEY WOULD GET PAID FOR

2    MOWING LAWNS FOR WHAT SHE'S DONE?

3        MS. SERANO:  I'M SAYING THERE ARE TWO DIFFERENT

4    ANALYSES THAT YOUR HONOR CAN DO, AND I THINK THE ENRICHMENT ONE

5    IS THE MORE APPROPRIATE ONE, SO THAT'S HOW WE ARRIVED AT THE

6    NUMBERS WE DID.

7        THE COURT:  RIGHT.  I THINK THE LATTER APPROACH IS

8    ABSOLUTELY UNREAL.  NOW THE REALITY IS, I DON'T KNOW THAT --

9    IT'S A LITTLE PROBLEMATIC FOR ME BECAUSE I'M NOT SURE THAT SHE

10   REALLY -- YOU KNOW, I'M NOT SURE THAT SHE ACTUALLY WORKED THE

11   SEVEN DAYS A WEEK, AND THAT SHE ACTUALLY BROUGHT IN $1,200

12   EVERY DAY.  DID SHE TESTIFY TO THAT AT TRIAL?  BECAUSE I

13   THOUGHT SOMETIMES SHE SAID SHE BROUGHT IN LESS.

14       MS. SERANO:  SHE MISSED THE QUOTA A FEW TIMES, AND

15   THAT'S WHEN THE ASSAULTS OR THREATS, IS WHAT SHE TESTIFIED,

16   THAT THAT IS WHAT SHE WAS SUPPOSED TO BE DOING, THE QUOTA WAS

17   INCREASED AFTER THE OTHER INDIVIDUAL LEFT.

18       EVEN IF YOU HAVE THAT $500 A DAY --

19       THE COURT:  YEAH --

20       MS. SERANO:  -- THERE WAS NO DISPUTE THAT SHE MADE AT

21   LEAST $500 A DAY, AND HALF THAT IS $90,000.

22       THE COURT:  THAT IS WHAT I WAS THINKING.  THE PROBLEM

23   IS, THIS IS SORT OF LIKE USING A MAGICAL DART BOARD, I SUPPOSE,

24   FOR FIGURING OUT WHAT A FAIR AMOUNT IS.  SHE JUST TOLD ME SHE

25   WENT THROUGH THREE DAYS OF LABOR BECAUSE OF THIS ABORTION THAT

1   SHE WAS FORCED TO HAVE.  YOU KNOW, AND I WONDER IS THERE A

2   VALUE TO THAT?  DOES SHE NOT GET COMPENSATED FOR THAT?

3       I'LL TELL YOU WHAT, I DON'T KNOW WHAT TO MAKE OF THIS.

4   I'M NOT ORDERING $180,000 WORTH OF RESTITUTION.  NO. 1, I DON'T

5   KNOW THAT HE'D EVER BE ABLE TO PAY.  AND ALL THAT IS GOING TO

6   DO IS, WHEN HE IS RELEASED FROM CUSTODY, IT'S LIKELY TO DRIVE

7   HIM BACK INTO CRIMINAL ACTIVITY.  SO --

8           MR. LANAHAN:  YOUR HONOR, MR. SMITH, JUST TO --

9   MR. SMITH SAID ALSO -- I WASN'T AT THE TRIAL THEN, I THINK IT

10  DID COME OUT -- SHE WAS SUPPOSED TO BE HOME BY 5:00.  THERE WAS

11  SOMETHING ABOUT THAT.  SO THAT MIGHT HAVE CUT INTO HER WORKING

12  HOURS.  I'M NOT GOING TO STOP THE COURT WHERE IT'S GOING.

13  BECAUSE THE IDEA THAT SOMEBODY WOULD MAKE $360,000 A YEAR DOING

14  THIS IS KIND OF HARD TO BELIEVE.  ANYWAY, SO --

15          THE COURT:  I DON'T KNOW, BUT IT'S GOT TO BE

16  PROFITABLE BUSINESS, OTHERWISE --

17          MR. LANAHAN:  BUT THAT KIND OF PROFIT, A LOT OF

18  PEOPLE WOULD DO IT.

19          MS. SERANO:  UNFORTUNATELY, A LOT OF PEOPLE DO DO IT,

20  AND THAT IS WHAT IS UNFORTUNATE.

21          THE COURT:  WELL, I'M GOING TO TRY TO COME UP WITH A

22  NUMBER.  IT PROBABLY HAS NO REAL SCIENTIFIC BASIS, BUT IT'S

23  LIKE --

24          MR. LANAHAN:  NEITHER DOES MUCH OF MODERN ECONOMICS

25  FOR THE LAST FIVE YEARS, SO --

THE COURT:  WELL, I TRIED TO FIGURE IT AT $25 PER
QUARTER.  MY CALCULATOR KEEPS TELLING ME THAT COMES OUT TO A
TOTAL OF $3,000 FOR RESTITUTION, AND THAT IS NOT RIGHT.  THERE
IS NO WAY, THAT IS TOO LOW.

MS. SERANO:  YOUR HONOR, THERE WAS ALSO SOME PROPERTY
THAT HE ABANDONED, THAT WE WOULD LIKE TO USE THE PROCEEDS TO
PUT TOWARDS THE --

THE COURT:  YOU'RE TALKING ABOUT THE MERCEDES?

MS. SERANO:  AND THE HYUNDAI AND THE JEWELRY.

THE COURT:  YOU HAVE GOOD EARS.  THAT IS WHAT MY
COURTROOM DEPUTY JUST REMINDED ME OF.

MR. LANAHAN:  YOUR HONOR, WE HAVE NO OBJECTION.

THE COURT:  GOOD.  ALL RIGHT.  I'LL ISSUE A
FORFEITURE ORDER, A FORFEITURE ORDER AS IN THE AMENDED ORDER.
I'M NOT SURE IF I SIGNED THE AMENDED ORDER.

MS. SERANO:  I THINK YOUR HONOR SIGNED THE
PRELIMINARY, BUT YOUR HONOR DIDN'T SIGN THE FINAL, WHICH HAS TO
HAPPEN TODAY.  AND THE ADJUSTMENT FORM BOX HAS TO BE CHECKED.

THE COURT:  YOU KNOW, ACTUALLY I DID SIGN IT.  I
SIGNED THE AMENDED ORDER OF CRIMINAL FORFEITURE ON AUGUST 22ND.
THAT MAY BE AN AMENDED ORDER OF THE PRELIMINARY FORFEITURE,
WHICH I SIGNED ON AUGUST 22ND, 2011.

IN ANY EVENT, I WILL MAKE MY PRIOR AMENDED ORDER OF
CRIMINAL FORFEITURE FINAL TODAY.

AND, MS. SERANO, IF YOU WOULD DO ME A FAVOR AND SUBMIT IT

1    TO MY CHAMBERS, I'LL MAKE SURE IT GETS SIGNED TODAY.  AND THE

2    PROCEEDS FROM THE SALE OF THE FORFEITURE CAN GO TO THE VICTIM

3    IN THE CASE.

4         YOU KNOW, THE BEST I CAN DO WITH THIS, I'M GOING TO ORDER

5    HALF OF WHAT -- OF $180,000 THAT HAS BEEN ASKED FOR, WHICH IS

6    $90,000.  BECAUSE I REALLY DON'T HAVE ANY OTHER WAY -- THERE IS

7    NO QUESTION, THERE IS NO QUESTION THAT MR. SMITH INCURRED

8    UNJUST ENRICHMENT AS A RESULT OF HIS CRIMINAL ACTIVITY.  THERE

9    IS NO QUESTION THAT THE VICTIM IN THIS CASE WAS FORCED TO WORK

10   IN PROSTITUTION.  AND THERE IS NO QUESTION THAT SHE'S BEEN

11   HARMED.  THERE IS NO QUESTION, AS SHE STATED TODAY, THAT SHE'S

12   HAD TO GO THROUGH THREE DAYS -- WELL, THERE IS NO QUESTION THAT

13   THERE WAS BOTH PHYSICAL AND MENTAL HARM TO HER ON TOP OF THAT.

14        BUT I DON'T HAVE A SCIENTIFIC WAY TO COME UP WITH A

15   NUMBER.  I CAN USE $180,000, PLUS THE $29,000, THERE IS NO WAY

16   HE'S EVER GOING TO PAY THAT.  SO I'M GOING TO HALF THAT, AND

17   THAT IS ALL THERE IS TO IT.  I'LL ORDER THAT HE PAY $90,000 OF

18   RESTITUTION.  I'LL ORDER THAT THE PROCEEDS FROM THE ITEMS

19   FORFEITED WILL BE APPLIED TO THAT.

20        I'LL FURTHER ORDER THAT HE PAY THAT, PLUS A $200 SPECIAL

21   ASSESSMENT, $100 PER COUNT, TO BE PAID IN INSTALLMENTS OF $25

22   PER QUARTER, PAYABLE TO THE INMATE FINANCIAL RESPONSIBILITY

23   PROGRAM, TO THE SOUTHERN DISTRICT COURT CLERK, IN SAN DIEGO.

24        I'LL ORDER THAT ANY BALANCE DUE AND OWING AT THE TIME OF

25   HIS RELEASE FROM CUSTODY BE PAID PRIOR TO THE EXPIRATION OF HIS

1    SUPERVISED RELEASE.

2            MS. SERANO:  YOUR HONOR, MAY I ASK THAT THE

3    RESTITUTION BE PAID FORTHWITH, THAT YOUR HONOR ORDER THAT?

4            THE COURT:  WELL, LET ME ASK YOU, IF I ORDER THAT, HE

5    DIDN'T -- IF HE DOESN'T HAVE THE ABILITY TO PAY THAT, DOESN'T

6    THAT AUTOMATICALLY PUT HIM IN VIOLATION?

7            MS. SERANO:  WHEN HE GETS IT, HE HAS TO PAY IT.  THE

8    WAY IT WORKS IS, THAT FOR EXAMPLE, IF HE HIT THE LOTTERY, AND

9    YOUR HONOR ONLY ORDERED HIM TO PAY, SAY, $100 A QUARTER OR

10   SOMETHING LIKE THAT, IF YOUR HONOR ORDERS IT FORTHWITH, THEN

11   THE GOVERNMENT CAN GO OUT OR HELP ATTACH THAT SUM.

12           THE COURT:  I SEE.  SO YOU'RE SAYING, IF THERE ARE

13   OTHER ASSETS THAT HE MIGHT HAVE IN HIS NAME, OR MIGHT BE --

14   THAT MAKES SENSE.

15           MS. SERANO:  RIGHT.

16           MR. LANAHAN:  YOUR HONOR, I DON'T HAVE ANY OBJECTION

17   TO IT AS LONG AS THE COURT ORDERS NO INTEREST.

18           THE COURT:  I'M NOT SURE WHAT THE LAW IS ON THIS

19   SUBJECT.  IS THERE INTEREST THAT ACCRUES ON RESTITUTION ORDERS?

20           MS. SERANO:  I BELIEVE IT IS 5 OR 10 PERCENT A YEAR,

21   BUT THAT'S FINE.

22           THE COURT:  ALL RIGHT, FINE.  NO INTEREST WILL BE --

23           MR. LANAHAN:  I UNDERSTAND THE GOVERNMENT'S -- I SEE

24   WHAT YOU'RE SAYING.  IF HE HITS THE LOTTERY OR THERE IS SOME --

25   YOU KNOW, HE WRITES A BEST SELLER, WHATEVER.

1          THE COURT:  NO INTEREST.  ALL RIGHT, GOOD.

2      NOW, MR. LANAHAN, IF YOU WOULD DELIVER TO MR. SMITH THE

3  CONDITIONS OF SUPERVISED RELEASE, PLEASE.

4          MR. LANAHAN:  ALL RIGHT.  THANK YOU.

5          THE COURT:  ALL RIGHT, MR. SMITH, IN YOUR HAND IS --

6  ARE THE SUPERVISED RELEASE CONDITIONS.  REMEMBER THAT IF YOU

7  VIOLATE THOSE CONDITIONS, SIR, YOU CAN BE PLACED IN CUSTODY FOR

8  UP TO AN ADDITIONAL, I BELIEVE IT IS FIVE YEARS?  DIDN'T I SAY

9  FIVE YEARS?

10         MS. SERANO:  YES, YOUR HONOR.

11         THE COURT:  FIVE YEARS.  THAT IS FIVE YEARS OVER AND

12 ABOVE THE 30 YEARS THAT I'VE JUST IMPOSED AND OVER AND ABOVE

13 ANY OTHER SENTENCE THAT YOU MIGHT RECEIVE FOR ANY OTHER OFFENSE

14 THAT YOU MIGHT COMMIT.

15     SIR, I WANT TO TELL YOU THAT YOU HAVE A RIGHT TO APPEAL.

16 IF YOU WISH TO APPEAL, YOU MUST FILE THAT NOTICE OF APPEAL WITH

17 THIS COURT, NOT WITH THE NINTH CIRCUIT COURT OF APPEALS.  THAT

18 NOTICE OF APPEAL MUST STATE SPECIFICALLY WHAT IT IS YOU'RE

19 APPEALING FROM.  THAT NOTICE MUST BE FILED WITHIN 14 DAYS FROM

20 TODAY'S DATE.

21     YOU DO HAVE A RIGHT TO HAVE A LAWYER TO REPRESENT YOU.  IF

22 YOU CANNOT AFFORD TO HIRE A LAWYER, ONE WILL BE APPOINTED FOR

23 YOU AT NO COST TO YOU.

24     NOW, MR. LANAHAN, I BELIEVE YOU'RE RETAINED, CORRECT?

25         MR. LANAHAN:  THAT'S CORRECT, YOUR HONOR.  RIGHT.

1          THE COURT:  GREAT.  I ASSUME YOU'LL BE FILING THE

2   NOTICE OF APPEAL FOR HIM?

3          MR. LANAHAN:  I WILL.  I NEED TO SEE WHETHER IT IS

4   GOING TO BE AS PRO PER OR ME AS COUNSEL, BUT ONE WAY OR THE

5   OTHER, IT WILL DEFINITELY GET FILED.

6          THE COURT:  IS THERE ANYTHING ELSE WE NEED TO

7   ADDRESS?

8          MS. SERANO:  NO, YOUR HONOR.

9          THE COURT:  IF NOT, THEN THIS HEARING IS ADJOURNED.

10         MR. LANAHAN:  THANK YOU.

11         MS. SERANO:  THANK YOU.

12         MR. GARDNER:  THANK YOU, YOUR HONOR.

13                    (RECESS AT 1:04 P.M.)

14                       ---000---

15

16

17

18

19

20

21

22

23

24

25

1          C-E-R-T-I-F-I-C-A-T-I-O-N

2          I HEREBY CERTIFY THAT I AM A DULY APPOINTED,

3   QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED

4   STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND CORRECT

5   TRANSCRIPT OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED CAUSE;

6   THAT SAID TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPTION OF MY

7   STENOGRAPHIC NOTES; AND THAT THE FORMAT USED HEREIN COMPLIES

8   WITH THE RULES AND REQUIREMENTS OF THE UNITED STATES JUDICIAL

9   CONFERENCE.

10          DATED:  FEBRUARY 29, 2012, AT SAN DIEGO, CALIFORNIA

11

12          _____
                    S/DEBORAH M. O'CONNELL, CSR #10563
13                  REGISTERED PROFESSIONAL REPORTER

14

15

16

17

18

19

20

21

22

23

24

25